WALTER O. PARMAN, APPELLANT, *v.* JOHN PETRICCIANI AND GUILIA PETRICCIANI, HIS WIFE, RESPONDENTS; BRADFORD R. HEWINS, INTERVENOR-RESPONDENT.

No. 3770

June 23, 1954.                    272 P.2d 492.

*Griswold, Vargas & Bartlett,* and *John S. Halley,* of Reno, for Appellant.

*John S. Sinai, John W. Coulman,* and *David P. Sinai,* of Reno, for Respondents.

*Guild, Busey & Guild,* of Reno, for Intervenor-Respondent.

## OPINION

By the Court, MERRILL, J.:

This is an action brought by appellant seeking a declaratory judgment determining the rights of the parties under a lease and declaring that the lease is valid, subsisting and enforceable. Defendants' motion for summary judgment was granted by the trial court and the action dismissed. From that judgment plaintiff has taken this appeal. We shall refer to the parties by name.

On October 17, 1951 the Petriccianis as lessors entered into a lease of certain premises in the city of Reno. Three persons were named as lessees: appellant Parman, one Pechart and one Kessel. The term of the lease was ten years. The total rental was specified as $528,-012. It was expressly provided that the premises should be used "for the sole purpose of conducting therein and thereon a general gaming and bar business." Paragraph 27 of the lease provided in part: "In the event the lessees, or either of them, cannot obtain the requisite licenses to conduct a gaming business on the premises * * * from the proper licensing authorities in the State of Nevada, County of Washoe and City of Reno, then this lease shall become null and void and of no further force and effect as herein set forth and Lessors herein shall have the right to proceed to lease and lease said property to other parties or do anything they desire with said premises without any claim of damage or injury on the part of the Lessees against the Lessors * * *."

Pechart and Kessel were unable to secure licenses from the state authorities. On May 29, 1952 while action on Parman's application for license was still pending, he was notified by the Petriccianis that they had canceled and annulled the lease. Parman contends that this action was wrongful.

The trial court having acted by summary judgment, the essential question is whether genuine issues of fact were created by the pleadings and proof offered. Rule 56(c) N.R.C.P. In determining this question we shall accept as true the allegations and affirmations favorable to the position of the plaintiff. Smith v. Hamilton, 70 Nev. 212, 265 P.2d 214. Parman contends that in two respects genuine issues have been created.

First: He contends that paragraph 27 as quoted is ambiguous since it is susceptible of a construction other than that which the Petriccianis and the trial court have placed upon it; that since it is ambiguous, its construction becomes a question of intent, a question of fact for determination upon trial; citing Walsh v. Walsh, 18 Cal.2d 439, 116 P.2d 62. The validity of this contention would appear to depend upon whether the paragraph is reasonably subject to the second construction.

The construction given by the Petriccianis and accepted by the trial court was that if any one of the three lessees was unable to secure the necessary licenses, the lease was thereby rendered void. The construction contended for by Parman is that if any one of the three lessees could obtain a license, the lease would continue operative and in full force for his benefit.

All parties appear to recognize that one may not serve as an active or interested party to a gaming operation in this state unless properly licensed; that no one of the original lessees under the lease in question could, therefore, continue as lessee unless he was properly licensed. Parman's construction, then, is equivalent to

saying that by the paragraph in question the Petriccianis have stated that they are as willing to continue the lease to any one of their three lessees, individually and solely, as they are to the three combined. Such construction is, we feel, not only contrary to the apparent intent of the paragraph as expressed, but, under the circumstances surrounding the lease, is unrealistic to the point of being wholly unreasonable.

The lease, as we have noted, specified rental of over a half million dollars. Parman, in a deposition which forms a part of the record on motion for summary judgment, testified that it had been agreed between the three lessees that he was not to put up any money in the operation of the business; that he personally was financially unable to perform the terms of the lease; that the down payment of $10,000 provided by the terms of the lease had been paid by the other lessees. Clearly the three lessees in combination possessed attributes essential to performance which would not be possessed by Parman alone. To accept as reasonable the construction for which Parman contends would in this case be to impute to the Petriccianis a blithe lack of concern with the financial responsibility of their lessee. The existence of such an unbusinesslike attitude, as we shall note, is wholly inconsistent with the facts.

Parman contends that his construction of the paragraph is borne out by conduct of Petricciani subsequent to execution of the lease. We find no merit in this contention. The actions of Petricciani upon which Parman relies most heavily are discussed later in this opinion in our consideration of his second principal contention. In our view they clearly support the construction adopted by the trial court and in that respect render wholly insignificant other minor inconsistencies of conduct cited by Parman which we do not, accordingly, deem it necessary to discuss.

The paragraph in question not being reasonably subject to the construction for which Parman contends,

cannot be said to be ambiguous in that regard. The agreement speaks for itself and the true intent of the contracting parties cannot be said to constitute a genuine issue of fact.

Second: Parman contends that a genuine issue has been raised as to whether the Petriccianis have waived their rights to assert forfeiture of the lease and by their conduct are estopped to deny that it continues to run to Parman as sole lessee. He asserts that he relied to his detriment upon actions of the Petriccianis affirming the lease notwithstanding failure of Pechart and Kessel to secure licenses and upon representations that his rights under the lease were to continue. The Petriccianis contend that if representations were made, they were not to the effect that the old lease would continue with Parman as sole lessee, but rather were to the effect that a new lease would be granted with new parties substituted for Pechart and Kessel.

This distinction, considering the nature of this action, is a vital one. This is not a suit for specific performance to compel the giving of a promised new lease. It is an action to establish that the executed lease continues in effect with Parman as sole lessee. If the representations did in fact relate to a new lease, the court could not properly concern itself with them, nor with the question whether, under any conceivable state of facts, such representations were wrongful or actionable or unconscionable. With this distinction in mind we turn to the representations upon which Parman relies as shown by his own testimony upon deposition. Did these representations relate to the giving of a new lease with new parties as lessees or to the continuance of the old lease with Parman as sole lessee?

Parman testified as follows:

"Q. Did you ever discuss the matter of a lease with Mr. Petricciani at any time? * * * I am talking about the year 1953. A. I discussed getting Mr. Magee on the lease. * * *

"Q. What did you talk to him about? A. To try to get Mr. Magee on the lease if Mr. Kessel and Pechart dropped out of the picture. * * *

"Q. That was in the event that Pechart and Kessel got off the lease would he take Mr. Magee in as a party to the lease? A. That is right. * * *

"Q. And what did you say and what did Mr. Petricciani say? A. * * * I can't tell you the exact conversation, but I spoke about Mr. Magee and if Pechart and Kessell should drop out, I would like to have him consider a man by the name of Magee who had sufficient capital to finance me in this deal. * * *

"Q. In the conversation that you had with Mr. Petricciani did you discuss the terms of the lease under which Mr. Magee, as you say, wanted to become a party to the lease? A. We discussed something at Mr. Magee's house one day.

"Q. And what was that to your best recollection? A. Mr. Ferris, Howard Ferris, was the one who done most of the talking with regard to a proposition with Mr. Petricciani in which Mr. Petricciani would get 25% and the rent would be $5,000 a month, that is a guaranteed five thousand a month. Mr. Petricciani didn't agree to it, or he didn't disagree to it. He didn't admit anything.

"Q. Was that deal satisfactory to you at that time, $5,000 a month and 25%? A. Yes, it was at that time.

"Q. Who was present at that meeting? A. Mr. Petricciani, Mr. Ferris, Mr. Magee and myself.

"Q. Was anything said at that meeting as to who was to draw up a lease with those provisions in it, or when it was to be done, or anything like that? A. No, it was just a discussion to see if Mr. Magee could get on the lease to take up Pechart's and Kessel's interests.

"Q. Do you remember any other conversation that you had with Mr. Petricciani or Mrs. Petricciani in respect to the lease? A. Yes. I went down to Mr. Petricciani's house one afternoon and he asked me if I was going through with the license, and I said, 'Yes, I

was,' so his boy Silvio at the same time asked me, 'Are you going through with this lease?' and I said, 'Yes, I am.' He said, 'Do you have enough capital, enough bank-roll to go through with this deal?' and I said, 'Yes, I have plenty of money behind me, financial backing,' and he said, 'Would you mind telling me who this man is?' and I said, 'No, I don't care to disclose his name at this time,' and he said, 'That is all right, I just asked you.'

"Q. Was that the extent of that conversation? A. We discussed different things about Reno and Las Vegas and one thing and another and Mr. Petricciani said, 'Walter, I will make you a good landlord,' and I said, 'I will make you a good tenant, John.' "

This testimony, we feel, shows beyond question of a doubt that both Parman and Petricciani had in mind at all times a new lease or a modification of the old lease with Magee or someone else suitable to Petricciani as lessee in place of Pechart and Kessel. Never did Petricciani represent a willingness to continue Parman as lessee without regard to additional financial support. In each instance the question of such support was raised and discussed. It was taken for granted by both Parman and Petricciani. Parman, then, was given no assurance upon which he could reasonably assume anything but a willingness on the part of Petricciani to enter into a new lease with new parties, providing the new parties met with Petricciani's approval. No waiver or estoppel relating to the old lease has, then, been established.

As conduct amounting to an affirmance of the lease Parman relies upon the repayment by the Petriccianis to Pechart and Kessel of the sum of $10,000 paid by them upon execution of the lease. The lease provided that this sum was to be retained by the lessors "whether or not the lease becomes effective." Upon its return to Pechart and Kessel releases were signed by them of any rights they might have had under the lease.

There is no issue of fact here. The question is whether inferences favorable to Parman may reasonably be drawn as to the significance of the transaction and the intent of the parties thereto. Parman's interpretation of the transaction is that Pechart and Kessel were thereby released as lessees leaving Parman as surviving lessee under a continuing lease.

In considering this contention we must not lose sight of the fact that by virtue of defaults in the securing of licenses required by the lease, the lease was rendered null and void or, at the least, subject to termination. Parman's position is that notwithstanding the status of the lease, Petricciani by his conduct affirmed its continuance and is estopped to deny such continuance. The transaction in question is asserted to constitute such affirmance. It is not enough, then, that by regarding it in a certain light it may be found consistent with affirmance. It must itself speak that affirmance. No express affirmance is claimed. In our view the transaction is entirely consistent with termination of the lease. It can hardly, then, be said to imply an affirmance.

Assuming an intent on the part of Petricciani to continue the lease in full force and effect, he would hardly be likely not only to release the only financially responsible parties to it, but, as well, voluntarily to bid them God-speed by returning their deposit. The only possible construction, in our view, is that the transaction was nothing more than a voluntary return, to those who had made it, of a substantial payment made in expectation that the lease would become effective: action consistent only with a general recognition by all parties to the transaction that the lease was at an end.

Parman seems to find something sinister in this willingness on the part of Petricciani to pay $10,000 which he was not legally obligated to pay. The record indicates that the payment was made pursuant to an oral understanding and that a similar deposit was secured from the new lessee with whom Petricciani subsequently

dealt. We find nothing sinister in one's willingness to live up to the terms of an understanding with which he could not legally be compelled to comply.

Parman insists that the trial court has misconceived the function of summary judgment and has in this case improperly proceeded on the hearing to resolve issues which should only have been resolved on trial. Many judicial statements of the function of summary judgment have been quoted, all of which we approve.

In Doehler Metal Furniture Co. v. U.S., C.C.A.2d, 149 F.2d 130, 135, it is stated, "We take this occasion to suggest that trial judges should exercise great care in granting motions for summary judgment. A litigant has a right to a trial where there is the slightest doubt as to the facts * * *. Such a judgment, wisely used, is a praiseworthy time-saving device. But, although prompt despatch of judicial business is a virtue, it is neither the sole nor the primary purpose for which courts have been established. Denial of a trial on disputed facts is worse than delay."

In Griffith v. William Penn Broadcasting Co., Dist. Pa., 4 F.R.D. 475, 477, it is stated, "The presence of a real and material issue of fact precludes further consideration of the matter under this rule [56]. * * * It is not sufficient that the court may not credit the evidence to be offered or that the weight of the evidence is clearly in favor of one party. Under such circumstances the parties are entitled to a trial by jury to determine the facts."

There can be no question as to these well-established principles. Summary judgment may not be used as a short cut to the resolving of disputes upon facts material to the determination of the legal rights of the parties. We are not here concerned with such a factual dispute, however.

For the purpose of our decision we have accepted as true the facts alleged and deposed most favorable to

Parman's position. Yet he cannot be said to have demonstrated any rights under the lease. No genuine issue of fact can be said to have been raised.

Affirmed with costs.

EATHER, C. J., and BADT, J., concur.