*935 OPINION

Per Curiam:

FACTS

In January 1981, appellant Robert E. Dickenson (“Dicken-son”) and respondent the State of Nevada, Nevada Department of Wildlife (“the State”) signed an agreement which allowed the State to enlarge the Illipah Reservoir located on Illipah Creek. Both the creek and the reservoir are located on Dickenson’s land. The State intended to enlarge the reservoir for fishing and public recreation purposes while continuing to provide irrigation water for Dickenson’s land.
The agreement, which is the subject of this appeal, acknowledged that Dickenson owned all outstanding water rights on Illipah Creek, except for “certain existing stock water rights,” which belong to two other ranchers. The agreement also acknowledged that the State wanted the reservation of a 160 acre-foot minimum pool for purposes of public fishing and recreation.
The agreement went on to provide that Dickenson would have access to the outlet works (valves) of the dam. The State agreed to install a device to indicate when the water in the minimum pool fell below the 160 acre-foot minimum level. No drawdown was permitted below the minimum level “except as hereinafter provided, and except when mutually agreed otherwise in writing between Owners . . . and the Department.” Dickenson was permitted to manage the water in the reservoir at his discretion, “excepting the water below the 160 [acre-feet] volume marking device.” Emergency drawdown was only permitted by mutual agreement.
The agreement provided that storage rights contemplated by the agreement were subject to the referenced stock water rights “which shall be satisfied from the 160 acre-foot pool if there is not sufficient creek flow and/or water storage above said 160 acre-foot pool to satisfy said right.” Finally, the agreement provided that Dickenson may graze cattle in the vicinity of the reservoir “without interference and may use the reservoir for stock water.”
The parties signed the agreement on January 9, 1981. Thereafter, the State constructed the reservoir. In addition, the State established a fishery in the reservoir by planting rainbow trout in the spring and fall of each year.
In September 1991, the State filed a complaint, a motion for a preliminary injunction and a motion for a temporary restraining order against Dickenson. The State alleged that Dickenson had, *936 on several occasions the previous year, opened the valve of the dam without its consent, releasing water to flood his stock ponds several miles downstream. This release caused the level of the minimum pool to drop sixteen inches below the minimum level. The State claimed that Dickenson’s actions of removing water significantly and adversely affected the fish in the reservoir.
The district court granted a temporary restraining order and enjoined Dickenson from removing any water from the reservoir without the permission of the State when the water was below the minimum 160 acre-foot level. Later, after holding a hearing, the district court issued a temporary injunction that enjoined Dicken-son from removing water from the reservoir and provided for a lock on the valve.
Dickenson filed an answer, asserting that his water rights were senior to the State’s storage rights and therefore could be satisfied from the minimum pool. For this reason, he claimed that he had not breached the agreement by drawing stock water from the minimum pool.
In May 1993, both parties moved for summary judgment. The court granted summary judgment for the State, holding that the agreement was clear on its face in granting the State a minimum pool which Dickenson may use only with the State’s consent. The court also held that Dickenson had violated the agreement by releasing water without the State’s permission, and that there was a distinct risk that he may do so again, thus causing irreparable harm to the wildlife and recreation resources. Accordingly, the court permanently enjoined Dickenson from removing water from the minimum pool without the State’s consent whenever the water level in the minimum pool fell below the 160 acre-foot level.
Dickenson appeals, arguing that the district court erred in its interpretation of the agreement by holding that the agreement abrogated his superior right to draw stock water from the minimum pool. We agree and reverse the district court’s decision.

DISCUSSION

The parties agree that the facts in this case are not in dispute. This court has held that in the event the parties do not dispute the facts, the question of the interpretation of a contract is a question of law. Grand Hotel Gift Shop v. Granite St. Ins., 108 Nev. 811, 815, 839 P.2d 599, 602 (1992). In such situations, this court will review the district court’s findings de novo as a question of law. Id.
Dickenson contends that the intent of the agreement was to limit his use of the reservoir for irrigation, not stock water. He points out that none of the preliminary acknowledgements evi *937 dence an intent that the terms of the agreement are meant to govern his stock water rights. He notes that the State interprets the stock water provision to apply only to other ranchers. However, he maintains that it would make no sense to interpret the contract to mean that water could be taken through the creek on his land to neighboring lands to water stock, but that he is precluded from using the reservoir for his own stock. Finally, he argues that nowhere does the agreement indicate that he intended to relinquish his stock water rights.
The State contends that there is no provision in the agreement for the unilateral use of the minimum pool. According to the State, all references to water are generic and there is no distinction between stock water and irrigation water. Further, the State argues that it would be unreasonable to limit the use of the reservoir for irrigation water but not stock water.
This court has held that when a contract is ambiguous, it will be construed against the drafter. Williams v. Waldman, 108 Nev. 466, 473, 836 P.2d 614, 619 (1992). If there is an ambiguity requiring extrinsic evidence to discern the parties’ intent, summary judgment is improper. Mullis v. Nevada National Bank, 98 Nev. 510, 513, 654 P.2d 533, 535 (1982). However, if no ambiguity exists, the words of the contract must be taken in their usual and ordinary signification. Parsons Drilling, Inc. v. Polar Resources, 98 Nev. 374, 376, 649 P.2d 1360, 1362 (1982). An interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract. Sterling v. Goodman, 102 Nev. 218, 220, 719 P.2d 1262, 1263 (1986).
Taking the provisions of the contract in order, it becomes clear that the earlier provisions are modified by the later provisions. Paragraph five provides that drawdown below the minimum level is prohibited “except as hereinafter provided, and except when mutually agreed otherwise . . . .” (Emphasis added.) Paragraph seven complements this by providing that Dickenson may manage the reservoir at his discretion, “excepting the water below the 160 acre-foot volume marking device.” In addition, paragraph eight allows drawdown for emergencies if both parties consent. Taken together, these provisions permit Dickenson to remove water at his discretion, provided the pool remains above the 160 acre-foot level. When the water drops below that level, he must seek the State’s permission.
However, paragraph five contains the words “except as hereinafter provided.” Paragraph eleven goes on to address stock water *938 and provides that “the above-described stock water rights” shall be satisfied from the pool “if there is not sufficient creekflow and/or water storage above said 160 acre-foot pool to satisfy said right.” (Emphasis added.) A literal reading of this provision allows an owner of the stock water rights to draw stock water from the pool if the creek is dry even if the pool is below the minimum level. Paragraph fifteen also addresses stock water and provides that Dickenson “may use the reservoir for stock water.” Accordingly, we conclude that these two provisions permit Dick-enson to use the reservoir at his discretion for stock water when the creek is dry.
This interpretation is particularly applicable in light of the acknowledgment on page one which provides that “owners [Dickenson] own all outstanding water rights on Illipah Creek, except for certain stock water rights.” (Emphasis added.) This acknowledgment appears to provide that Dickenson owns some stock water rights. Therefore, paragraph eleven, which refers to “the above-described stock water rights” would include Dicken-son’s stock water rights. The storage rights in paragraph eleven aré then subject to Dickenson’s stock water rights which are to be satisfied from the minimum pool.
The State asserts that “the only stock water rights mentioned in the agreement are those of downstream users who are not signatories to the agreement.” This is obviously incorrect in light of paragraph fifteen which refers to Dickenson’s right to use the reservoir for stock water.
We therefore hold that the agreement permits Dickenson to draw stock water from the minimum pool. Paragraph eleven, when construed against the State as the drafter, permits Dicken-son to draw water whenever there is “not sufficient creek flow,” even if the minimum pool is below the 160 acre-foot level. The words “and/or” make such a reading possible. Under this interpretation, the district court erred in enjoining Dickenson from drawing water from the minimum pool without the consent of the State when the pool falls below the 160 acre-foot minimum.
In conclusion, we hold that the proper interpretation of the contract permits Dickenson to draw water from the minimum pool for stock water purposes at his discretion. Accordingly, we reverse the decision of the district court and remand with instructions to enter judgment for Dickenson.