129 Nev., Advance Opinion 33

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| JACK GALARDI, AN INDIVIDUAL; AND BIRDIE, LLC, A NEVADA LIMITED LIABILITY COMPANY, Appellants, vs. NAPLES POLARIS, LLC, A NEVADA LIMITED LIABILITY COMPANY, Respondent. | No. 58261 |

**FILED**

MAY 16 2013

Appeal from a district court order granting summary judgment in a contract action. Second Judicial District Court, Washoe County; Brent T. Adams, Judge.

*Affirmed.*

Armstrong Teasdale LLP and Bruce A. Leslie and Bret F. Meich, Las Vegas,
for Appellants.

Holland & Hart, LLP, and J. Stephen Peek, Timothy A. Lukas, and Tamara Reid, Reno,
for Respondent.

_____

BEFORE PICKERING, C.J., HARDESTY and SAITTA, JJ.

*OPINION*

By the Court, PICKERING, C.J.:

This dispute arises out of a written option contract. Under the contract, respondent Naples Polaris had the right to purchase Las Vegas real property from appellants Jack Galardi and Birdie, LLC (together,

13-14456

Galardi), for $8 million "cash." The property was subject to a deed of trust securing approximately $1.3 million in debt. The question is whether Naples or Galardi must pay off the $1.3 million debt. Specifically, does the option contract require Galardi to deliver clear title, meaning Galardi must remove the $1.3 million encumbrance for a net $6.7 million option price? Or does it contemplate that Naples take title subject to preexisting encumbrances, so that Galardi receives the full $8 million option price?

The district court granted summary judgment to Naples. Galardi appeals and we affirm.

I.

Naples acquired its option rights by assignment from Galardi's lessee, French Quarter, a nonparty. The deed of trust securing the $1.3 million debt predated the option. French Quarter was operating a topless club on the property but losing money and filed for bankruptcy protection. We simplify the facts slightly, but what happened next is the bankruptcy trustee lined up a fourth party to acquire the property and Naples' option. The price was handsome—enough to pay off the $1.3 million encumbrance, to give Galardi the full $8 million option price he demanded, and to generate surplus funds for Naples and French Quarter's creditors.

Naples and Galardi welcomed the Bankruptcy court sale. But they could not agree on whether the $1.3 million needed to retire the preexisting encumbrance against the property should come out of Naples' or Galardi's share of the sale proceeds. They stipulated to let the sale close, with Galardi receiving $8 million and Naples reserving the right to sue Galardi in state court for the $1.3 million. This suit over the proper interpretation of the option contract followed, which the district court decided on cross-motions for summary judgment.

 

The option contract is in writing and includes an integration clause. The contract is silent as to preexisting encumbrances in general and the $1.3 million debt in particular. It says simply:

> Buyer [Naples] shall have an option to purchase the above described real estate for the sum of $8,000,000 (Eight Million Dollars) cash. . . . Buyer [Naples] shall pay all costs of transfer and closing whereby Seller [Galardi] shall receive full purchase price.

In their motions for summary judgment, both sides argued that the option contract, as written, unambiguously favored its position. Each focused on the phrase, "Buyer shall pay all costs of transfer and closing whereby Seller shall receive full purchase price." Galardi argued that "costs of transfer and closing" encompasses preexisting indebtedness, so that he receives the $8 million "full purchase price" with no deductions. Naples countered that "costs of transfer and closing" refers to transaction costs such as recording fees and transfer taxes, not encumbrances. In Naples' view, if Galardi meant for Naples to take title subject to preexisting encumbrances, he needed to write the option contract to say so specifically.

Both Naples and Galardi supported their readings of the contract with testimonial evidence. Galardi offered excerpts from his deposition, in which he testified that he understood that the deal would net him $8 million; that French Quarter (later Naples, as French Quarter's assignee) would "pick up the bank note, clean it up, send me $8 million and I'm gone." Naples offered an expert affidavit from Diane Erickson, past president and current certification chair for the Nevada Escrow Association with considerable Nevada real estate industry experience. Addressing the contract provision that "Buyer shall pay all

costs of transfer and closing," Ms. Erickson opined that in the real estate industry, "[c]losing costs are separate and apart from the purchase price and normally consist of the title policy fee, escrow fee, real property transfer tax, recording fees, etc." She further opined, based on her "experience in the industry, that whenever real property is transferred, it is always given to the purchaser free and clear of any encumbrances or liens, unless the agreement specifically states that it is to be acquired 'subject to' the existing encumbrance, and the buyer specifically agrees to take over the payments of the existing loan."

Galardi did not dispute the real-estate-industry usages and customs detailed in the Erickson affidavit. He argued instead that the district court could only consider the Erickson affidavit if it deemed the contract ambiguous and that, if the contract were ambiguous, it would take a trial to resolve the ambiguity. The district court disagreed. It deemed the contract unambiguous when considered in light of the trade usages described in the Erickson affidavit; it rejected the deposition testimony offered by Galardi as insufficient to create a genuine issue of material fact. The district court thus granted summary judgment to Naples and denied Galardi's cross-motion for summary judgment.

## II.

"[I]n the absence of ambiguity or other factual complexities," contract interpretation presents a question of law that the district court may decide on summary judgment, *Ellison v. Cal. State Auto. Ass'n*, 106 Nev. 601, 603, 797 P.2d 975, 977 (1990), with de novo review to follow in this court. *May v. Anderson*, 121 Nev. 668, 672, 119 P.3d 1254, 1257 (2005). Whether a contract is ambiguous likewise presents a question of law. *Margrave v. Dermody Props.*, 110 Nev. 824, 827, 878 P.2d 291, 293 (1994). A contract is ambiguous if its terms may reasonably be

SUPREME COURT
OF
NEVADA

(O) 1947A

4

interpreted in more than one way, *Anvui, LLC v. G.L. Dragon, LLC*, 123 Nev. 212, 215, 163 P.3d 405, 407 (2007), but ambiguity does not arise simply because the parties disagree on how to interpret their contract. *Parman v. Petricciani*, 70 Nev. 427, 430-32, 272 P.2d 492, 493-94 (1954) (concluding that summary judgment was appropriate because the interpretation offered by one party was unreasonable and, therefore, the contract contained no ambiguity), *abrogated on other grounds by Wood v. Safeway, Inc.*, 121 Nev. 724, 121 P.3d 1026 (2005). Rather, "an ambiguous contract is 'an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning.'" *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009) (quoting *Whiting Stoker Co. v. Chicago Stoker Corp.*, 171 F.2d 248, 251 (7th Cir. 1948)).

Citing *Dickenson v. State, Dep't of Wildlife*, Galardi argues that the district court erred in considering Naples' expert evidence of trade usage and industry custom because it did not first declare the option contract ambiguous. 110 Nev. 934, 937, 877 P.2d 1059, 1061 (1994) ("If there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper. However, if no ambiguity exists, the words of the contract must be taken in their usual and ordinary signification." (internal citation omitted)). Galardi argues that the district court compounded its error, adding insult to injury, when it deemed the deposition excerpts he submitted about how he understood the deal terms insufficient to generate a genuine issue of material fact. *But see Kaldi v. Farmers Ins. Exch.*, 117 Nev. 273, 281, 21 P.3d 16, 21 (2001) (when an integrated written contract is unambiguous, "parol evidence may not be used to contradict [its] terms").

Galardi's arguments track the former common-law rule that trade usage and industry "custom can only supply incidents to a contract when the contract is ambiguous on the point to which the party seeks to apply the custom." 12 Richard A. Lord, *Williston on Contracts* § 34:7 (4th ed. 2012). But this rule has lost adherents over time. *Id.* Modernly, courts consult trade usage and custom not only to determine the meaning of an ambiguous provision, but also to determine whether a contract provision is ambiguous in the first place.[1] *See, e.g.*, Restatement (Second) of Contracts § 220 cmt. d (1981) ("[U]sage relevant to interpretation is treated as part of the context of an agreement in determining whether there is ambiguity or contradiction . . . . There is no requirement that an ambiguity be shown before usage can be shown . . . ."); 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.13, at 121 (rev. ed. 1998) ("Seldom should the court hold that the written words of a contract exclude evidence of the custom, since even what are often called 'plain' meanings are shown to be incorrect when all the circumstances of the transaction are known; and usages and customs are a part of those circumstances by which the meaning of words is to be judged.").

Contract interpretation strives to discern and give effect to the parties' intended meaning. *Id.* at 118-19. Words derive meaning from usage and context. "It would be passing odd to forbid people to look up words in dictionaries, or to consult explanatory commentaries that, like

---

[1]Although the Uniform Commercial Code (U.C.C.) does not control this real-property-based dispute, we note that the U.C.C. expressly allows evidence of "'usage of trade'" to explain an agreement's terms. *United Servs. Auto Ass'n v. Schlang*, 111 Nev. 486, 493, 894 P.2d 967, 971 (1995) (quoting NRS 104.2202(1)); *see Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 536-38 (9th Cir. 2011) (applying Nevada U.C.C. and citing *Schlang*).

trade usage, are in the nature of specialized dictionaries" in interpreting a written contract. *Matter of Envirodyne Indus.*, 29 F.3d 301, 305 (7th Cir. 1994). We thus conclude, as other modern courts have, that "[a]mbiguity is not required before evidence of trade usage . . . can be used to ascertain" or illuminate contract terms. *Puget Sound Fin., LLC v. Unisearch, Inc.*, 47 P.3d 940, 943 (Wash. 2002); *accord Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) ("Trade practice and custom illuminate the context for the parties' contract. . . . Before an interpreting court can conclusively declare a contract ambiguous or unambiguous, it must consult the context in which the parties exchanged promises."); *Hickman v. Groves*, 71 P.3d 256, 260 (Wyo. 2003) ("[E]vidence of usage may be admissible to give meaning to apparently unambiguous terms of a contract" even "where other parol evidence," such as "the parties' statements of what they intended the contract to mean[,] are not admissible." (internal quotations omitted)); *Intersport, Inc. v. NCAA*, 885 N.E.2d 532, 539 (Ill. App. 2008) ("contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered"); *cf. Warrington v. Empey*, 95 Nev. 136, 139, 590 P.2d 1162, 1164 (1979) ("custom and usage may be used to establish the terms of a contract" (dictum)).

We recognize that, ordinarily, "[t]he existence and scope of a usage of trade are to be determined as questions of fact." Restatement (Second) of Contracts § 222(2) (1981). To illustrate: If Galardi had presented admissible evidence to contradict Ms. Erickson's statements about the Nevada real estate industry's conventions and usages, a genuine issue of material fact may have arisen that would defeat summary



judgment. *Compare Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 58-59 (1st Cir. 1996) (describing usage evidence held sufficient to create a genuine issue of material fact and defeat summary judgment in a contract interpretation case), *with Simon Wrecking Co. v. AIU Ins. Co.*, 530 F. Supp. 2d 706, 716 (E.D. Pa. 2008) (holding that party adequately defeated opposing party's trade usage argument with proof the usage claimed either did not exist or differed from that argued). But NRCP 56(e) provides that, when a properly supported "motion for summary judgment is made," the adverse party "must set forth specific facts showing that there is a genuine issue for trial" or "summary judgment, if appropriate, shall be entered." Thus, summary judgment may be granted in a case requiring interpretation of an integrated written contract, if supported by admissible evidence of trade usage that is both "persuasive" and "unrebutted." *Puget Sound Fin., LLC*, 47 P.3d at 943; *see* Restatement (Second) of Contracts § 212(2) (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law."); *see Intersport*, 885 N.E.2d at 538-40 (consulting industry usages in interpreting an integrated written contract and affirming judgment on the pleadings); 5 *Corbin on Contracts, supra,* § 24.30, at 327.

The district court properly deemed the Erickson opinion admissible and the option contract unambiguous in light of the trade usage Ms. Erickson's affidavit established. "A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to

justify an expectation that it will be observed with respect to a particular agreement." Restatement (Second) of Contracts § 222(1) (1981).[2] In this case, Galardi did not challenge Ms. Erickson's qualifications or the legitimacy and relevance of her opinions. Ms. Erickson opined that unless otherwise expressly stated, real property is "always given to the purchaser free and clear of any encumbrances or liens." *See* NRS 111.170(1)(b) (Nevada grant, bargain and sale deeds, "unless restrained by [contrary] express terms," include a covenant that the property conveyed is "free from encumbrances"). She further opined that, in the escrow setting, the phrase "costs of transfer and closing" signifies costs "separate and apart from the purchase price and normally consist[ing] of the title policy fee, escrow fee, real property transfer tax, recording fees, etc."

Ms. Erickson's expert opinions comport with the language of the option contract and make sense in light of both common law and Nevada statutes. To credit Galardi's contrary reading that "costs of transfer and closing" encompasses preexisting encumbrances would mean that Galardi could have increased the option price at will just by borrowing against the property and passing the debt along to the optionee, which is unreasonable. The phrase "costs of transfer and closing" thus does not carry a double meaning that renders the option contract

---

[2]Galardi, French Quarter, and Naples had counsel or commercial real estate experience or both. Thus, Galardi makes no argument that he did not know or have reason to know of the Nevada real estate industry usages that the Erickson affidavit addressed. *See* Restatement (Second) of Contracts § 222(3) (1981) ("[A] usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement.").

ambiguous. *See Parman*, 70 Nev. at 430-31, 272 P.2d at 493-94. Nor does the reference to "full purchase price" render the contract ambiguous, particularly when read in light of the industry usages detailed in the Erickson affidavit.

The deposition testimony Galardi offered that he (and perhaps French Quarter) understood the deal terms to require the optionee to take subject to existing encumbrances would, if admitted, contradict the option contract's express terms. It thus was inadmissible under the parol evidence rule. *Daly v. Del E. Webb Corp.*, 96 Nev. 359, 361, 609 P.2d 319, 320 (1980) ("The parol evidence rule forbids the reception of evidence which would vary or contradict the contract, since all prior negotiations and agreements are deemed to have been merged therein."). Allowing extrinsic evidence of objective facts such as industry usage and custom does not open the door to a party's subjective understanding of a contract's terms, when that understanding contradicts the contract's express terms. *Cf. AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 575 (7th Cir. 1995) (discussing the admissibility of objective evidence as distinguished from the subjective testimony by the parties as to what they believe the contract means in the related context of construing ambiguous contracts); *Campanelli v. Conservas Altamira, S.A.*, 86 Nev. 838, 841, 477 P.2d 870, 872 (1970) (parties to a written contract are bound by its terms regardless of their subjective beliefs at the time the agreement was signed). The extrinsic evidence with which Galardi opposed Naples' properly supported summary judgment motion was either inadmissible or irrelevant or both, and thus insufficient to generate a genuine issue of material fact or to establish his entitlement to judgment as a matter of law.

## III.

The district court properly considered trade usage and industry custom in interpreting the option contract, even though it also found that the contract was unambiguous. For the option contract to require the optionee to take the property subject to existing indebtedness, it needed to so state. We therefore agree with the district court that the contract placed responsibility for the $1.3 million debt on Galardi's side of the ledger and affirm.

_____, C.J.
Pickering

We concur:

_____, J.
Hardesty

_____, J.
Saitta