130 Nev., Advance Opinion 95

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY,<br>Appellant/Cross-Respondent,<br>vs.<br>COAST CONVERTERS, INC.,<br>Respondent/Cross-Appellant. | No. 59639 <br><br>FILED <br><br>DEC 24 2014 <br><br>TRACIE K. LINDEMAN <br>CLERK OF SUPREME COURT <br>BY_____ <br>CHIEF DEPUTY CLERK |

Appeal and cross-appeal from a judgment on a jury verdict finding an insurance company liable for breach of contract and violation of the Nevada Unfair Claims Practices Act. Eighth Judicial District Court, Clark County; Gloria Sturman, Judge.

*Vacated in part, reversed, and remanded.*

Lewis Roca Rothgerber LLP and Daniel F. Polsenberg and Joel D. Henriod, Las Vegas; Pyatt Silvestri and James P.C. Silvestri, Las Vegas, for Appellant/Cross-Respondent.

Lee, Hernandez, Landrum, Garofalo & Blake, APC, and David S. Lee and Robert A. Carlson, Las Vegas; Lemons, Grundy & Eisenberg and Robert L. Eisenberg and Tiffinay B. Pagni, Reno, for Respondent/Cross-Appellant.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, GIBBONS, C.J.:

This case involves a dispute between an insured manufacturer and its insurer. In the present case, electrical problems at a plastic bag manufacturing plant led to damaged machinery and an increased number of defective bags being produced. Following the electrical problems, the

14-42033

manufacturer filed a claim with its insurance company. However, a dispute arose between the parties regarding whether losses associated with the defective bags should be covered under the insurance policy's property damage provision or its business interruption/extra expense provision. The parties further disputed whether a policy limit of $2 million or $5 million should apply to the manufacturer's property loss. The district court submitted both of these issues to the jury. Following trial, the jury awarded the manufacturer $4,005,866 for breach of the insurance contract, impliedly finding that the insured's loss was property damage and that the $5 million property damage policy limit applied.

In this opinion, we first address whether categorizing the insured's loss under the policy presents a question of law or a question of fact. We conclude that categorizing the insured's loss under the policy is a question of law. Second, we address whether determining which policy limit applies to the insured's property loss presents a question of law or a question of fact. We conclude that determining which policy limit applies presents a question of law. Accordingly, we conclude that the district court erred in sending these questions to the jury. We therefore reverse the district court's judgment and remand this matter for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Respondent/cross-appellant Coast Converters, Inc., manufactured plastic bags in California. In 2003, Coast began moving its plastic bag factory, including machines and equipment, from California to Las Vegas. Corresponding with the move, in June 2003, Coast obtained a commercial package all-risk insurance policy from appellant/cross-respondent Federal Insurance Company. The insurance policy covered up to $2 million in property damage (PD) and up to $1.75 million for business

interruptions/extra expenses (BI/EE). On August 27, 2003, Coast requested, and later received, an increase in the PD coverage limit from $2 million to $5 million.

In anticipation of Coast's move to Las Vegas, electrical modifications were made to the Las Vegas facility. However, the modifications were apparently inadequate, causing voltage fluctuations. The voltage fluctuations damaged machinery used in the manufacturing process and also caused the production of a larger-than-normal amount of defective bags, or "scrap."

Coast filed a claim with Federal Insurance, seeking to recover costs related to the damaged machinery and the production of increased scrap. Coast pointed out that the defective bags were often hidden in rolls of otherwise quality bags, rendering the defective bags largely undiscoverable prior to sale. While it was able to pull some of the rolls containing defective bags, Coast claimed that it was not made aware of the defects until several orders were returned. Thus, Coast asserted that it was unable to separate the defective bags from the quality ones, rendering the entire package of bags a total loss.

Upon receiving Coast's claim, Federal Insurance investigated the machine malfunctions and eventually made several payments to Coast. Initially, Federal Insurance did not communicate under which provision, PD or BI/EE, the payments were made. Federal Insurance later allocated a small portion of the payments—relating to the damaged machinery—to the PD coverage. However, the majority of the payments, including payments for the increased scrap, were made under the BI/EE coverage. Ultimately, Federal Insurance disbursed amounts covering the increased scrap and other losses up to the entire $1.75 million BI/EE

policy limit. Coast contended that the increased scrap losses should have been covered under the PD provision. However, Federal Insurance disagreed and refused to make any additional payments under the PD provision. Coast alleges that it ultimately went out of business as a result of Federal Insurance's refusal to pay. Coast then filed a complaint against Federal Insurance.

Both before and after trial, Federal Insurance asked the district court to determine (1) whether Coast's loss fell under the policy's PD provision or the BI/EE provision; and (2) if PD coverage was appropriate, whether the coverage limit was $2 million or $5 million. The district court, however, declined to answer these questions, opting instead to leave them to the jury. After a five-week jury trial, the jury found Federal Insurance liable in the amount of $4,005,866 for breaching the insurance contract and in the amount of $5,048,717 for violating the Nevada Unfair Claims Practices Act (UCPA), NRS 686A.310. The district court offset the judgment by amounts Coast obtained in settlement for its claims against other parties. The district court, however, refused to offset the judgment by the amount already paid on the increased scrap insurance claim, and awarded Coast attorney fees and prejudgment interest.

Federal Insurance now appeals, arguing that (1) the district court erred in refusing to rule, as a matter of law, on the policy coverage and policy limit issues, as well as on the UCPA claims; (2) substantial evidence does not support the jury's findings on the breach of contract and UCPA claims; (3) the jury erred in finding it liable under the UCPA; (4) the district court erred in refusing to offset the judgment by the amount already paid on the claim; and (5) the district court erred in granting

attorney fees as special damages. Coast cross-appeals, arguing that the district court erred in offsetting the judgment by amounts obtained in settlements and in its calculation of prejudgment interest.

## DISCUSSION

*Categorizing Coast's loss under the policy was a question of law for the district court to decide*

Federal Insurance argues that the district court erred in allowing the jury to determine which policy provision, PD or BI/EE, applied to Coast's increased scrap. We agree.

In contract matters, the jury may be charged with deciding any factual disputes. *State, Univ. & Cmty. Coll. Sys. v. Sutton*, 120 Nev. 972, 983, 103 P.3d 8, 15 (2004). But "'in the absence of ambiguity or other factual complexities,' contract interpretation presents a question of law" for the district court to decide, "with de novo review to follow in this court." *Galardi v. Naples Polaris, L.L.C.*, 129 Nev. ___, ___, 301 P.3d 364, 366 (2013) (quoting *Ellison v. Cal. State Auto. Ass'n*, 106 Nev. 601, 603, 797 P.2d 975, 977 (1990)); *see also Farmers Ins. Exch. v. Neal*, 119 Nev. 62, 64, 64 P.3d 472, 473 (2003) (noting that the task of interpreting a contract is a question of law).

Here, deciding which policy provision, PD or BI/EE, applies to Coast's increased scrap is a question of contract interpretation, and thus, is a question of law. Because categorizing Coast's loss under the policy is a question of law, the district court erred in sending it to the jury. Moreover, because the policy provision dispute is a question of law, "[t]his court is obligated to make its own independent determinations and should not defer to those of the district court." *Musser v. Bank of Am.*, 114 Nev. 945, 947, 964 P.2d 51, 52 (1998); *see also Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909-10 (N.Y. 1973) (interpreting an

insurance policy, even though the issue was wrongly sent to the jury below, where the policy was unambiguous and the parties agreed that no extrinsic evidence bearing on the parties' intent existed).

Accordingly, as the parties have fully briefed the legal interpretation issue before this court, we will now address whether the policy's PD provision or the BI/EE provision covered Coast's increased scrap.

*Interpretation of the insurance policy*

"An insurance policy is a contract that must be enforced according to its terms to accomplish the intent of the parties." *Farmers Ins. Exch.*, 119 Nev. at 64, 64 P.3d at 473. We consider an insurance policy as a whole, giving it a reasonable and harmonious reading. *Century Sur. Co. v. Casino W., Inc.*, 130 Nev. ___, ___, 329 P.3d 614, 616 (2014). "If a provision in an insurance contract is unambiguous, a court will interpret and enforce it according to the plain and ordinary meaning of its terms." *Powell v. Liberty Mut. Fire Ins. Co.*, 127 Nev. ___, ___, 252 P.3d 668, 672 (2011); *cf. Grand Hotel Gift Shop v. Granite State Ins. Co.*, 108 Nev. 811, 819, 839 P.2d 599, 604 (1992) (stating that ambiguous or unclear terms in an insurance contract are resolved in favor of the insured). "'[W]hether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted.'" *Powell*, 127 Nev. at ___, 252 P.3d at 672 (quoting *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 120 Nev. 678, 684, 99 P.3d 1153, 1157 (2004)). This court "will not rewrite contract provisions that are otherwise unambiguous . . . [or] increase an obligation to the insured where such was intentionally and unambiguously limited by the parties." *Farmers Ins. Grp. v. Stonik ex rel. Stonik*, 110 Nev. 64, 67, 867 P.2d 389, 391 (1994).

Here, prior to determining, as a matter of law, whether Coast's increased scrap is covered by the policy's PD provision or the BI/EE provision, one factual question must be resolved by the jury: on what date did Coast become aware that continued use of its machines would result in the production of an increased amount of scrap? We conclude that increased scrap produced after this date is covered by the policy's BI/EE provision, and increased scrap produced before this date is covered by the policy's PD provision.[1]

*The BI/EE provision applies to excess scrap produced after Coast became aware that continued use of its machines would result in the production of an increased amount of defective bags*

The parties dispute whether Coast knew that the continued use of its machines would produce an increased number of defective bags. Federal Insurance argues that as of October 2003, Coast was aware of the machinery and electrical problems and decided to continue to use those machines to manufacture bags, despite being aware that scrap would be produced at a higher rate than normal.[2] Coast contends that, while it became aware of electrical problems in September 2003 and of the resulting damaged bags in October 2003, it investigated those issues and only continued production after it was determined that the problems had been fixed. Coast further asserts that it was not until additional damaged

---

[1]The record indicates that even under normal manufacturing conditions, at least some scrap was produced. Accordingly, coverage under both the BI/EE provision and PD provision will only apply to scrap that is produced in excess of the normal amount.

[2]The record suggests that Coast normally produced around 8% scrap, which increased to upwards of 20% sometime after the electrical problems began.

bags were returned and additional investigation was conducted that it became aware of the full extent of the damaged machinery and the connection to the defective bags. It is undisputed, however, that Coast continued bag production throughout the relevant period in order to meet its obligations to customers.

We conclude that the proper interpretation of the insurance policy is that the BI/EE provision applies to increased scrap produced after Coast became aware that continued use of its machines would result in the production of an increased amount of defective bags. The BI/EE provision applies to increased scrap produced after this date for two reasons.

First, increased scrap produced after this date unambiguously fits the definition of an extra expense under the policy. The policy defines extra expense in relevant part as "necessary expenses you incur: in an attempt to continue operations, over and above the expenses you would have normally incurred." Defective bags produced after the date Coast was aware that continued production would lead to increased scrap fits the definition of an "extra expense," because it was an expense above that associated with normal production, which Coast incurred "in an attempt to continue operations" in order to fulfill customer obligations despite ongoing electrical problems.

Second, scrap produced after this date cannot be categorized as property based on the implied requirement of fortuity; hence, it can only be covered under the policy's BI/EE provision. It is well recognized that insurable loss of or damage to *property* must be occasioned by a fortuitous, noninevitable, and nonintentional event. *See City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 47-48 (2d Cir. 2003);

*Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1281 (6th Cir. 1995) ("The application of the implied requirement of fortuity [to insurance contracts] is universally recognized." (internal quotation omitted)); *see also Avis v. Hartford Fire Ins. Co.*, 195 S.E.2d 545, 547-49 (N.C. 1973). In other words, a loss occasioned by the insured's own decision to act in a way that will predictably result in a loss is not fortuitous; and thus, such a loss is generally not covered. *See, e.g., Univ. of Cincinnati*, 51 F.3d at 1282 ("[C]ourts generally do not recognize deliberate actions that produce predictable and anticipated damages as fortuitous events under all-risk insurance policies."). Further, the fortuity principle applies even if not explicitly written into the insurance contract.[3] Thus, under the implied requirement of fortuity, the PD provision cannot apply to scrap produced as a result of Coast's decision to continue production despite being aware that damaged bags would be produced at a higher rate than normal.

In sum, deciding when Coast became aware that continued production would lead to increased scrap is a factual question for the jury. However, once the jury determines when that occurred, the district court must then apply that fact and conclude, as a matter of law, that increased scrap produced after that date is covered under the insurance policy's BI/EE provision.

---

[3]Here, Coast's duties under the policy included "[t]ak[ing] every reasonable step to protect the covered property from further damage."

*The PD provision applies to excess scrap produced before Coast became aware that continued use of its machines would result in the production of an increased amount of defective bags*

Here, the PD provision covered "direct physical loss or damage to . . . personal property caused by or resulting from a peril." The policy defines personal property as "all your business personal property; business personal property in which you have an insurable interest; patterns, molds and dies." Included in business personal property is "stock." The policy splits "stock" into four subcategories: (1) raw stock, (2) stock in process, (3) finished stock, and (4) goods held in storage for sale. "Raw stock" is defined as "material in the state in which you receive it for conversion into finished stock." "Stock in process" is defined as "raw stock that has undergone any aging, seasoning, mechanical or other process of manufacture, but which has not become finished stock." Finally, "finished stock" is defined as "goods you have manufactured which are in their completed state and ready for sale."

The policy explicitly defines these terms because the loss payment basis for "finished stock" is different than the loss payment basis for "raw stock" or "stock in process." Specifically, the loss payment basis for "finished stock" is the "selling price less the value of discounts and costs you would have incurred." In contrast, the loss payment basis for "raw stock" is the cash value or replacement value, and the loss payment basis for "stock in process" is the "cost of raw materials and costs expended as of the date of loss or damage." Because of the different loss payment basis, damaged property that is deemed to be "finished stock" may be valued much higher than property deemed to be another type of stock. Based on the evidence presented at trial and the jury's award of more than $4 million for Coast's breach of contract claim, it can be inferred that the

jury categorized the increased scrap as not only property, but also as "finished stock."

Federal Insurance argues that even if the increased scrap is covered by the PD provision, it cannot be "finished stock," because the defective bags were not "in their completed state and ready for sale." Federal Insurance argues that the bags were not "completed" because their defects resulted in them being returned. In contrast, Coast argues that the defective bags were "finished stock," because they had completed the manufacturing process and were sold.

First, we conclude that the PD provision applies to excess scrap produced before Coast became aware that continued use of its machines would result in the production of an increased number of defective bags. The PD provision covers "stock" as business personal property. The policy's definition of "stock" refers to the goods Coast produced. Thus, Coast's "stock" included the plastic bags, defective or otherwise, that it was in the business of producing. Accordingly, the defective bags produced by Coast were business personal property covered by the policy's PD provision.

Second, we conclude that the increased scrap that is covered by the PD provision unambiguously fits the definition of "finished stock," which is defined as "goods you have manufactured which are in their completed state and ready for sale." While the bags were ultimately returned to Coast because of defects, the defective bags had *completed* the manufacturing process and were sold to Coast's customers. In other words, the bags were in their "completed state," because there were no additional steps for Coast to take in the manufacturing process prior to sale. *See Merriam-Webster's Collegiate Dictionary* 254 (11th ed. 2007)

(defining "complete" as "having all necessary parts, elements, or steps"). Reading the policy as a whole, it is clear that the definition of "finished stock" was intended to include bags that have completed the manufacturing process but are ultimately returned for defects caused by a covered peril. This is evidenced by the fact that the loss payment basis for "finished stock" is the sales price of the goods. The policy provides that Coast be compensated for the sales price of the defective bags because, but for the covered peril—the damaged machinery—the defective bags would not have been returned and Coast would have realized the sales price from its customers.

In sum, we conclude that the PD provision applies to excess scrap produced before Coast became aware that continued use of its machines would result in the production of an increased amount of defective bags. We further conclude that the excess scrap covered by the PD provision must be categorized as "finished stock," and should be valued as such under the terms of the policy.

*Determining which PD policy limit applies was a question of law for the district court to decide*

Coast originally had PD coverage of $2 million which it later increased to $5 million. The parties now dispute whether the applicable PD policy limit is $2 million or $5 million. The district court left this decision to the jury. However, in Nevada, determining whether an insurance policy applies to ongoing property damage is decided using the "manifestation rule," a legal principle. *See Jackson v. State Farm Fire & Cas. Co.*, 108 Nev. 504, 509, 835 P.2d 786, 789 (1992). Accordingly, we conclude that determining which PD policy limit applies presents a

question of law; and thus, the district court erred in sending the issue to the jury.[4] Because determining which PD policy limit applies presents a question of law, this court will resolve the issue by making our "own independent determinations and [will] not defer to those of the district court." *Musser v. Bank of Am.*, 114 Nev. 945, 947, 964 P.2d 51, 52 (1998).

*Legal determination of the PD policy limit*

Federal Insurance argues that the district court erred in not adopting a legal rule to govern the question of whether the increased limit applies. Federal Insurance further argues that under applicable law, the $2 million policy limit applies because Coast knew or should have known of ongoing property damage when it applied for the policy limit increase on August 27, 2003. In response, Coast argues that the jury's award of $4,005,866 in breach of contract damages implies that the jury found that the $5 million policy limit applies, and that such a finding is supported by substantial evidence.

In *Jackson v. State Farm Fire & Casualty Co.*, this court adopted the so-called "manifestation rule." 108 Nev. at 509, 835 P.2d at

---

[4]The jury was given an instruction vaguely defining the "manifestation rule," but was not instructed on how this legal principle should be applied to its factual findings. Jury instruction No. 27 provided:

> [s]ometimes an event happens that causes continuing damage over time. In such a situation, insurance coverage is provided by the particular insurance in effect at the point in time appreciable damage occurs, and is or should be known to insured such that a reasonable insured would be aware that his notification duty under the policy has been triggered. This is known as the damage manifestation rule.

789. Under the "manifestation rule," an insurer is only liable under an insurance policy if the policy was in effect when the loss became manifest. *Id.* at 506, 835 P.2d at 788. A loss becomes manifest at the "point in time when appreciable damage occurs and is or should be known to the insured, such that a reasonable insured would be aware that his notification duty under the policy has been triggered." *Id.* at 509, 835 P.2d at 790 (internal quotation omitted). Further, "[t]he manifestation date will generally be a question of fact" for the jury; however, a court can decide the manifestation date "where the undisputed evidence establishes that no damage had been discovered before a given date." *Id.*

Here, the parties dispute when "manifestation" occurred. Because the date of manifestation is "generally . . . a question of fact," we conclude that determining when "manifestation" occurred is a question of fact for the jury to decide. *See id.* However, once the jury determines when "manifestation" occurred, the district court must then apply that fact to the law and determine which policy limit applies. Specifically, if the jury finds that Coast knew or should have known of "appreciable [property] damage" prior to increasing its PD coverage to $5 million, then the increase in coverage does not apply, and an award for breach of contract based on property damage cannot exceed $2 million. *See id.* (internal quotation omitted). In contrast, if the jury finds that Coast did not know or should not have known of "appreciable [property] damage" prior to increasing the PD coverage to $5 million, then the increase does apply and an award for breach of contract based on property damage cannot exceed $5 million. *See id.* (internal quotation omitted).

*Coast's UCPA claim is dependent on a proper interpretation of the contract*

At trial, Coast presented evidence suggesting that Federal Insurance violated the UCPA, in part because Federal Insurance

incorrectly determined that excess scrap was covered under the policy's BI/EE provision. Thus, Coast's UCPA claim must await the district court's determination of how the excess scrap should be categorized under the policy pending the jury's finding of when Coast became aware that continued production would lead to increased scrap. *FGA, Inc. v. Giglio*, 128 Nev. \_\_\_, \_\_\_, 278 P.3d 490, 496 (2012) (holding that a verdict cannot stand where one of several "overlapping factual theories support a single theory of recovery" and one of those theories is challenged on appeal). Accordingly, judgment on the jury's verdict regarding Federal Insurance's liability under the UCPA is vacated, and the issue is remanded for a new trial.

## *CONCLUSION*

First, we conclude that because contract interpretation is a question of law, the district court should have decided, as a matter of law, whether Coast's loss was covered under the policy's PD provision or its BI/EE provision. Thus, the district court erred in submitting this question to the jury. We further conclude that under a proper interpretation of the policy, losses incurred *after* Coast became aware that electrical problems would cause increased scrap to be produced are covered under the policy's BI/EE provision. Conversely, we conclude that losses incurred *before* Coast became aware that electrical problems would cause increased scrap to be produced are covered under the policy's PD provision, and should be valued as "finished stock."

Second, we conclude that determining which PD policy limit applies is a question of law for the district court to decide. Specifically, once the jury determines when Coast knew or should have known of "appreciable [property] damage," the district court must then apply the "manifestation rule" and determine which policy limit applies to Coast's

Supreme Court
OF
Nevada

(O) 1947A

15

property loss. Once the policy limit is established, a breach of contract award based on property damage cannot exceed that amount.

Finally, we conclude that because the jury's verdict on Coast's UCPA claim was influenced by an improper interpretation of the contract, the verdict must be vacated. We therefore vacate in part, and reverse and remand for further proceedings consistent with this opinion.[5]

_____, C.J.
Gibbons

We concur:

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

_____

[5]Based upon our holding, we vacate the award of attorney fees and do not address the other issues raised by the parties. Although we could address the remaining issues of law raised, many of these issues depend on the insurance coverage issue. Therefore, we conclude that it is not appropriate to address them at this time.