ROAD AND HIGHWAY BUILDERS, LLC, a NEVADA LIMITED LIABILITY COMPANY, APPELLANT, *v.* NORTHERN NEVADA REBAR, INC., a NEVADA CORPORATION, RESPONDENT.

No. 55542

ROAD AND HIGHWAY BUILDERS, LLC, a NEVADA LIMITED LIABILITY COMPANY, APPELLANT, *v.* NORTHERN NEVADA REBAR, INC., a NEVADA CORPORATION, RESPONDENT.

No. 56499

August 9, 2012                                        284 P.3d 377

*Pisanelli Bice PLLC* and *Todd L. Bice* and *Jarrod L. Rickard*, Las Vegas; *Carl M. Hebert*, Reno, for Appellant.

---

[4]Certified does not argue the district court's award of costs was improper. Therefore, we affirm that order.

*Holland & Hart LLP* and *Alex Flangas* and *Tamara Reid*, Reno; *Holland & Hart LLP* and *J. Lee Gray*, Greenwood Village, Colorado, for Respondent.

Before CHERRY, C.J., GIBBONS and PICKERING, JJ.

## OPINION

By the Court, CHERRY, C.J.:

These consolidated appeals address whether a claim for fraud in the inducement is available when the basis for the claim contradicts the very language of the contract at issue in the parties' dispute. We conclude that when a fraudulent inducement claim contradicts the express terms of the parties' integrated contract, it fails as a matter of law. Additionally, we address the propriety of the damages awarded by the jury under a separate claim for breach of contract. We affirm the compensatory damages award but reverse the punitive damages award, as we reverse the finding of fraud on which the punitive damages were based.

### FACTS

Appellant Road and Highway Builders, LLC (Builders), a general contractor, was awarded a contract with the Nevada Department of Transportation (NDOT) to build a 2.3-mile portion of the Carson City Freeway project (the Project), from U.S. Highway 50 to Fairview Drive. The Project required a substantial amount of reinforcing steel, or rebar, including an amount to be used in the installation of more than 3,000 lineal feet of reinforced concrete boxes (RCBs) under the roadway surface in order to drain water.

For the rebar subcontractor work, Builders chose respondent Northern Nevada Rebar, Inc. (NNR), based on NNR's pre-award bid to Builders. According to NNR, its bid, including the unit price for the rebar, was based upon providing all of the rebar needed pursuant to NDOT's plans and engineering estimates, which called for approximately 2.7 million pounds of black and epoxy-coated rebar and for manufacturing the RCBs by pouring the concrete in place at the job site. Even before incorporating NNR's bid into its bid to NDOT, however, Builders was considering using precast RCBs instead of poured-in-place RCBs and had begun the

requisite change approval process through NDOT. Builders decided that, if approval was granted, it would use a different subcontractor, Rinker Materials, to supply the substituted precast RCBs. However, Builders never communicated these plans to NNR, and Builders used NNR's subcontract bid in making its bid on the Project to NDOT.

After being awarded the contract but while waiting for NDOT's approval to use the precast RCBs, Builders began drafting a subcontract with NNR for all of the rebar work on the Project. Builders then, before obtaining approval from NDOT, submitted a purchase order to Rinker for the precast RCBs for the Project. A few weeks later, Builders delivered the written subcontract agreement to NNR. At this point, Builders had not disclosed to NNR that it was attempting to use precast RCBs from another supplier. Thus, Builders contemplated making deductions to the quantities of rebar that NNR would furnish and install under the draft subcontract. The day after Builders delivered the subcontract to NNR, NDOT gave approval for the substitution of approximately 80 percent of the poured-in-place RCBs. Builders did not update the subcontract or otherwise disclose this information to NNR.

Builders and NNR subsequently negotiated and agreed to a finalized subcontract (the Subcontract) for the Project's rebar work. The Subcontract provided that NNR would furnish all labor and materials necessary to fully perform and complete the work, which consisted of the full 2.7 million pounds of rebar, including the RCBs. The Subcontract also specified, however, that "[w]ithout invalidating this Subcontract[,] . . . [Builders] may, at any time or from time to time, order additions, deletions or revisions in the Work to be performed by [NNR]." And similarly, the Subcontract also stated, "[i]n addition to changes made or additional Work ordered by [NDOT] under the Contract, [Builders] reserves the right to make any change, including additions of omissions, in the Work to be performed by [NNR] under this Subcontract." The Subcontract set the nonmodifiable unit price of the rebar while at the same time recognizing that the final quantities of rebar would match NDOT's quantities unless otherwise agreed to in writing. Builders was granted the absolute right to terminate at any time and for any reason, and the parties expressly agreed that, in the event of such a termination, NNR's sole remedy would be payment for the work that it had performed up to the termination date. So as to preclude any oral understandings contrary to the Subcontract's written terms, the parties agreed that the written agreement was their only agreement.

After the Subcontract was executed, NNR began delivering and installing rebar on the Project. However, many of the precast RCBs had already been installed by Rinker. When NNR first learned of Builders' use of precast RCBs, it sought an equitable adjustment of

the unit price for the rebar pursuant to the Subcontract. Builders rejected the request, stating that it had a right to make the changes. In response, NNR sought payment for the work provided to date and demanded to be released from the Subcontract; nonetheless, NNR continued to work on the Project. Subsequently, Builders sent a letter to NNR stating that it had ceased all payments to NNR until the matter was resolved. NNR continued to work and responded to the cease-payment letter by requesting payment and withdrawing the demand to be released from the Subcontract.

Several weeks later, NNR's employees did not show up on the job site because, according to NNR, it was completely out of work while it was waiting for Builders to move dirt. The same day that NNR's employees did not show up, Builders sent a letter to NNR stating that NNR was in default for not showing up and informing NNR that it would be replaced immediately. After receiving the termination letter, NNR's employees indicated that they would not be returning. By that time, NNR had supplied 28 percent of the total black rebar and 6 percent of the total epoxy-coated rebar for the Project.

Builders filed suit against NNR the next day, alleging a claim for breach of contract. NNR answered and asserted several counterclaims against Builders, including fraud in the inducement, breach of contract, breach of the implied covenant of good faith and fair dealing, and consumer fraud. Builders replaced NNR with a new subcontractor, causing a 16-day delay and requiring Builders to pay $152,198 more than NNR's total bid price for the rebar on the Project, in addition to other delay damages.

After a failed attempt by Builders to remove NNR's fraudulent inducement counterclaim via summary judgment, the parties proceeded to trial. Following NNR's case-in-chief, Builders moved for judgment as a matter of law under NRCP 50(a), on the sole basis that NNR had failed to make a prima facie case for fraudulent inducement, but the district court denied the motion.

Following the four-day trial, the jury unanimously found against Builders on its claim and found in favor of NNR on its counterclaims. The jury awarded NNR $700,000 in compensatory damages. Because the jury found that there had been fraudulent conduct, the jury returned for further deliberation on punitive damages. The jury assessed $300,000 in punitive damages against Builders.

After judgment was entered on the jury verdict, Builders renewed its motion for judgment as a matter of law and sought a new trial; the district court denied Builders' motion. Builders appealed, arguing among other things that the district court erred in allowing NNR's fraud claims to proceed to trial when the basis for the fraud claims contradicts the very language of the Subcontract and that the defects in the fraud claims leave the damages awards unsupported.

## DISCUSSION

We first address whether the counterclaim for fraud in the inducement could proceed in this case when the basis for the claim contradicts the terms of the contract at issue in the parties' dispute. We then move on to address the propriety of the damages awards.

### Standard of review

Builders argues that it was entitled to summary judgment or judgment as a matter of law on NNR's counterclaim for fraud in the inducement. We review such rulings de novo. *Winchell v. Schiff*, 124 Nev. 938, 947, 193 P.3d 946, 952 (2008) (reviewing a district court's order granting or denying judgment as a matter of law de novo); *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (reviewing granting or denying of summary judgment de novo).

### Fraudulent inducement

Builders contends that the district court erred as a matter of law in allowing NNR's fraudulent inducement counterclaim to proceed, as the law precludes assertions of fraud when the alleged misrepresentation is contradicted by the parties' bargained-for terms.[1] *See, e.g.*, *Tallman v. First Nat. Bank*, 66 Nev. 248, 259, 208 P.2d 302, 307 (1949) (stating that "fraud is not established by showing parol agreements at variance with a written instrument and there is no inference of a fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed"); *Brinderson-Newberg v. Pacific Erectors*, 971 F.2d 272, 278 (9th Cir. 1992) (explaining that completely integrated contracts negate any oral agreements that provide for contrary interpretations of the contract terms). In particular, Builders argues that NNR cannot rest upon a purported promise concerning the amount of rebar NNR would provide for the Project, when that representation is at odds with the parties' agreed-upon contractual terms allowing Builders to reduce the quantity of rebar, stating that the unit price of the rebar was unaffected by quantity, and providing that the contract was terminable at will.

NNR contends that the facts presented at trial amply support the jury's finding that Builders committed fraud, insofar as Builders induced NNR to enter into a contract to provide all the rebar neces-

---

[1] NNR argues that Builders waived this argument and the argument that NNR is not entitled to punitive damages. However, because Builders raised these issues in the district court through a motion for summary judgment and in its request for judgment under NRCP 50(a), they are properly raised on appeal.

sary for the Project, without disclosing to NNR that it had no intention of performing its contractual obligations and had already ordered a substantial amount of the contracted rebar from another supplier. NNR argues that it was induced into entering into the contract and that it was induced into offering a lower unit price because of the large amount of rebar needed for the Project.

Reading the Subcontract as a whole and avoiding negating any contract provision, as we must, *see National Union Fire Ins. v. Reno's Exec. Air*, 100 Nev. 360, 364, 682 P.2d 1380, 1383 (1984); *Philips v. Mercer*, 94 Nev. 279, 282, 579 P.2d 174, 176 (1978), results in the reasonable interpretation that the parties contemplated a potential alteration in the scope of NNR's work. As explained by this court in *Tallman*, the purported inducement cannot be something that conflicts with the Subcontract's express terms, as the terms of the contract are the embodiment of *all* oral negotiations and stipulations. 66 Nev. at 257, 208 P.2d at 306. " 'When the plaintiff pleads that the writing . . . does not express the intentions of the parties to it at the time, he pleads something which the law will not permit him to prove.' " *Id.* (quoting *Natrona Power Co. v. Clark*, 225 P. 586, 589 (Wyo. 1924)); *see also Green v. Del-Camp Investment, Inc.*, 14 Cal. Rptr. 420, 422 (Ct. App. 1961) (stating that where "the claim[e]d fraud consists of a false promise with respect to a matter covered by the agreement itself, the oral evidence would contradict the terms of the agreement, in direct contravention of the rules. Such proof is not permitted."); *Sherrodd, Inc. v. Morrison-Knudsen Co.*, 815 P.2d 1135, 1137 (Mont. 1991) (providing that the exception made to the parol evidence rule when fraud is alleged "only applies when the alleged fraud does not relate directly to the subject of the contract. Where an alleged oral promise directly contradicts the terms of an express written contract, the parol evidence rule applies.").

The Subcontract specified that Builders could, at any time, order additions, deletions, omissions, or revisions to NNR's work. While the Subcontract specified that the final quantities of rebar would match NDOT's quantities unless otherwise agreed to in writing, the Subcontract also allowed for Builders to order revisions to NNR's work, regardless of any changes to the rebar work provided under the NDOT contract. Moreover, the Subcontract provided that the total price would be subject to additions and deductions for changes in the work and other adjustments, but that the unit prices were set to remain in force regardless of quantity. Therefore, while Builders might have breached the contract by unilaterally making alterations to the scope of work without an agreement in writing, this cannot form a basis for fraud under these cir-

cumstances. The parties contemplated a potential alteration in the scope of work, which NNR impliedly admits in its answering brief when it affirmatively quotes from the contract provision that "[f]inal quantities may vary and will match [NDOT's] quantities to [Builders] unless otherwise agreed to in writing" in support of its argument. Based on this, NNR's fraudulent inducement claim directly contradicts the terms of the contract, at least one of which NNR itself admits is an accurate representation of the parties' bargain. While Builders may have acted improperly by failing to obtain a written agreement before making changes in the scope of work, this amounts to a breach of contract, not a fraud. In light of the foregoing, we conclude that NNR's fraudulent inducement claim fails as a matter of law.[2]

## Compensatory damages

Builders argues that the jury's verdict indisputably rests only upon the defective fraudulent inducement claim because no other claim could sustain the jury's $700,000 compensatory damages verdict. Builders contends that under the contract, NNR would only be able to receive the actual cost of work completed, not for lost profits. However, we conclude that both NNR's breach of contract claim and its breach of the implied covenant of good faith and fair dealing claim fully support the award.

"We will affirm an award of compensatory damages unless the award is so excessive that it appears to have been given under the influence of passion or prejudice." *Bongiovi v. Sullivan*, 122 Nev. 556, 577, 138 P.3d 433, 448 (2006). Unless it is determined from all the evidence presented that a jury's verdict is clearly wrong, the jury's compensatory damage award should be left undisturbed. *Ringle v. Bruton*, 120 Nev. 82, 91, 86 P.3d 1032, 1038 (2004). In reviewing whether the evidence supports the jury's compensatory damage award, all favorable inferences must be drawn in favor of the prevailing party. *See Grosjean v. Imperial Palace*, 125 Nev. 349, 366, 212 P.3d 1068, 1080 (2009).

NNR provided testimony that it was owed $500,000 for labor and materials that it provided but for which Builders did not pay and a little over $200,000 for earned profits for work already

---

[2]The parties in this case failed to raise the argument that the risk of this type of problem was allocated in the contract; since the matter is incorporated into and not collateral to the contract terms themselves, breach of contract claims should prevail over tort claims. Because this argument was not raised, it will not be discussed further.

completed.[3] The jury unanimously found in favor of NNR on its counterclaims and awarded NNR $700,000 in compensatory damages. Thus, the jury's award corresponded with NNR's testimony regarding what NNR claimed it was owed for labor, material, and lost profits for completed work.

In light of the broad test enunciating that an award for damages will only be reduced or overturned if the award is clearly wrong, we conclude that the award of compensatory damages in this case is properly supported by the breach of contract claim or the breach of the implied covenant of good faith and fair dealing claim. *See Hilton Hotels v. Butch Lewis Productions*, 109 Nev. 1043, 1046, 862 P.2d 1207, 1209 (1993) (stating that the duty of good faith and fair dealing is always imposed on the contracting parties and becomes a part of the contract such that the remedy for the duty's breach is based on the contract). It is well established that in contracts cases, compensatory damages "are awarded to make the aggrieved party whole and . . . should place the plaintiff in the position he would have been in had the contract not been breached." *Hornwood v. Smith's Food King No. 1*, 107 Nev. 80, 84, 807 P.2d 208, 211 (1991). This includes awards for lost profits or expectancy damages. *Colorado Environments v. Valley Grading*, 105 Nev. 464, 470-71, 779 P.2d 80, 84 (1989) (adopting the test espoused in Restatement (Second) of Contracts § 347 (1979)).

The Restatement (Second) of Contracts § 347 (1981) sets forth the proper method for determining lost profit or expectancy damages. It provides that:

> [s]ubject to the limitations stated in §§ 350-53, the injured party has a right to damages based on his expectation interest as measured by
>
> (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus
>
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
>
> (c) any cost or other loss that he has avoided by not having to perform.

Pursuant to our caselaw and the aforementioned Restatement (Second) test, it was proper for the jury to award compensation to NNR under the breach of contract or the breach of the implied covenant of good faith and fair dealing claims for both its costs and for lost profits. The evidence supported that Builders' refusal to pay resulted in NNR losing the benefit of the bargain, *i.e.*, lost

---

[3]We reject Builders' argument that provision 15.2.1 of the Subcontract prevents recovery of lost profits on the work already performed under the contract.

profits, and the unpaid labor and material costs it provided on the job.

However, Builders asserts that NNR's claims for breach of contract and breach of the contractual duty of good faith and fair dealing cannot sustain such a verdict because the contract was terminable at Builders' convenience. Builders cites to *Dalton Properties, Inc. v. Jones*, 100 Nev. 422, 424, 683 P.2d 30, 31 (1984), for the proposition that when the contract is terminable at will, the terminated party cannot recover lost profits. We conclude that Builders' reliance on *Dalton* is misplaced because it deals with an award for unearned profits, 100 Nev. at 424, 683 P.2d at 31, while NNR's award was for lost profits on work already completed. In the instant matter, we conclude that because the jury could only have awarded $200,000 in lost profits, as NNR was owed $500,000 for labor and materials and was awarded $700,000, and as those lost profits were not future lost profits but were for work that was already completed, this does not run afoul of *Dalton* or the Restatement test. *See* Restatement (Second) of Contracts § 347 (indicating that damages should be reduced by any cost or other loss that has been avoided by no longer being required to perform).

## Punitive damages

Because we conclude that the fraudulent inducement claim fails as a matter of law, we further conclude that the award for punitive damages cannot stand. *Amoroso Const. v. Lazovich and Lazovich*, 107 Nev. 294, 298, 810 P.2d 775, 777-78 (1991) (explaining that punitive damages are not permissible for breach of contract claims (citing *Sprouse v. Wentz*, 105 Nev. 597, 781 P.2d 1136 (1989))). This award for punitive damages cannot be supported by the breach of the implied covenant of good faith and fair dealing as that claim sounds in contract, and not tort, in this instance. *See Hilton Hotels v. Butch Lewis Productions*, 109 Nev. 1043, 1046-47, 862 P.2d 1207, 1209 (1993) (concluding that while "[i]n certain circumstances, breach of contract, including breach of the covenant of good faith and fair dealing, may provide the basis for a tort claim," there is a special element of reliance or fiduciary duty that is required for the claim to sound in tort (quotation omitted)). As there was no special element of reliance or fiduciary duty here for the implied covenant claim to be based in tort, punitive damages cannot stand. Accordingly, we reverse the district court's award of punitive damages.[4]

---

[4]Builders also argues that the district court abused its discretion in sua sponte excluding the testimony of an expert witness. NNR asserts that Builders waived this argument by failing to object to the district court's ruling to exclude

For the foregoing reasons, we affirm the district court's judgment as to compensatory damages and we reverse the district court's judgment as to punitive damages.[5]

GIBBONS and PICKERING, JJ., concur.

the testimony. However, Builders raised this issue in its renewed motion for judgment as a matter of law or for a new trial, and the district court ruled on the issue, and thus, we address Builders' argument.

" 'Whether expert testimony will be admitted, as well as whether a witness is qualified to be an expert, is within the district court's discretion, and [we] will not disturb that decision absent a clear abuse of discretion.' " *Matter of Mosley*, 120 Nev. 908, 921, 102 P.3d 555, 564 (2004) (quoting *Mulder v. State*, 116 Nev. 1, 12-13, 992 P.2d 845, 852 (2000)). If the challenged issue would not have changed the outcome of the case, there is no violation of the party's substantial rights and thus no basis for granting a new trial. *Edwards Indus. v. DTE/BTE, Inc.*, 112 Nev. 1025, 1037, 923 P.2d 569, 576 (1996). We conclude that the district court did not abuse its discretion in the exclusion of the expert testimony as Builders makes no showing that the exclusion of the expert's proffered testimony would have in any way altered the outcome of any of NNR's claims.

[5]All other arguments raised by the parties are rendered moot by the disposition of this appeal.