NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0344n.06

Case No. 14-1614

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 07, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DEBOURAH MATTATALL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| TRANSDERMAL CORP, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | O P I N I O N |
| | ) | |

BEFORE:    GUY, MOORE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Early in the proceedings below, before discovery was conducted, the district court granted defendant's motion for summary judgment on plaintiff's breach of contract claims. The court held the claims were barred by a broadly worded release in a settlement agreement between the parties. The district court held the release was unambiguous and refused to consider extrinsic evidence purportedly clarifying the parties' intent. Plaintiff insists the release is ambiguous and that extrinsic evidence showing the parties did not intend the release to encompass the instant claims should be considered. For the reasons that follow, we vacate the summary judgment ruling and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The release at the heart of this appeal appears in a settlement agreement.  The Settlement Agreement resolved two lawsuits pending in the Ontario (Canada) Superior Court of Justice. The lawsuits stemmed from the transfer of assets from a Canadian corporation, DPM Therapeutics Corporation ("DPM"), to a United States corporation, Transdermal Corporation ("Transdermal"), organized under the laws of Nevada.  Principal players in the underlying disputes and named parties in both lawsuits were Dr. Pankaj Modi, M.D., and Debourah Mattatall, citizens of Canada.  Modi and Mattatall were business partners who formed DPM in 2005 to develop and market patented skin care products.  As DPM grew, Modi and Mattatall, directors of DPM, retained a controlling interest in DPM and continued to be its largest shareholders.

In 2008–09, Modi and Mattatall undertook to expand operations and ultimately transfer DPM assets to the newly formed Transdermal for the purpose of distributing DPM products in the United States.  When other DPM minority shareholders learned of the impending transfer, they brought suit by filing an "application" in the Ontario Superior Court of Justice to restrain the transfer ("the Fia Application," so named after the first named party in the caption, applicant Robert Fia).  Named as respondents in the action were DPM, Modi and Mattatall.  The Fia applicants alleged that the respondents' actions in undertaking to transfer DPM assets to Transdermal "have effected or have threatened to effect a result that is oppressive and is unfairly prejudicial to, or that unfairly disregards the interests of, the applicants as minority shareholders of DPM."  R. 12-9, Fia Application at ¶ 1(b), Page ID 297.

The Ontario court issued a preliminary injunction, but not until one day after the transfer had already been effectuated by execution of the Share Purchase Agreement on October 21,

2009. Modi and Mattatall thus sold their majority interest in DPM to Transdermal for an aggregate price of US$1,515,789.45, to be paid in accordance with specified terms. In conjunction with the transfer, Mattatall entered into an Employment Agreement with Transdermal, dated October 30, 2009, whereby she was employed as Executive Vice President. Modi became Transdermal's President.

Though the preliminary injunction came too late to halt Transdermal's purchase of Modi's and Mattatall's shares, it did restrain further transfer of DPM assets to Transdermal, and the Fia application remained pending in the Ontario court. On March 5, 2010, Transdermal filed its own application in the same Ontario court against DPM and the Fia applicants, the minority "dissenting" shareholders. Transdermal alleged that the pendency of the Fia Application was "preventing Transdermal from moving forward with its business plan." R. 20-2, Application at ¶ 2(t), Page ID 469. Transdermal sought "just and equitable" relief in the form of dissolution of DPM or, alternatively, an "order that the respondents sell their shares to Transdermal for fair value." *Id.* at ¶ 2(x), Page ID 469.

These are the two lawsuits that are the subject of the Settlement Agreement that includes the release here at issue. The instant case presents a five-count complaint by Mattatall, filed on October 15, 2013, and asserting breach-of-contract, unjust-enrichment and promissory-estoppel claims against Transdermal. Essentially, Mattatall alleges that Transdermal has failed to pay her monies due under both the Share Purchase Agreement and the Employment Agreement. Transdermal responded immediately—before filing an answer and before any discovery was conducted—by motion for summary judgment or, alternatively, to dismiss. In relevant part, Transdermal asserted that the release contained in ¶ 4 of the Settlement Agreement encompasses

and therefore bars Mattatall's claims. The district court heard oral arguments on April 17, 2014 and issued its opinion granting summary judgment the next day.

The district court held that the release is broad and unambiguous, releasing any and all claims arising from any matter that any party to the Settlement Agreement (of which Mattatall is one) may have against each other party. The court took note of extrinsic evidence submitted by Mattatall suggesting the parties mutually construed the release more narrowly at the time of execution. Finding the release unambiguous, however, the district court held it was precluded from considering the extrinsic evidence under the governing Nevada law—even as the court agreed with Mattatall "that it is not logical that she would intend to release her claims under the Stock Purchase and Employment Agreements." R. 29, Opinion and Order at 7, Page ID 530. Mattatall insists on appeal that there are several grounds justifying consideration of her extrinsic evidence.

## II. ANALYSIS

### A. Standard of Review

An order granting summary judgment is subject to de novo review. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the non-moving party, Mattatall, and draw all reasonable inferences in her favor. *Smith*, 708 F.3d at 825. Not just any factual dispute will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact. A dispute is "genuine" only if based on evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmovant. *Id*. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986)

(stating that "genuine fact issues [are those] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."). A factual dispute concerns a "material" fact only if its resolution might affect the outcome under the governing substantive law. *Crouch v. Honeywell Intern., Inc.*, 720 F.3d 333, 338 (6th Cir. 2013).

Interpretation of the Settlement Agreement is governed by the laws of Nevada. Absent ambiguity, interpretation of a contract presents a question of law. *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013). Whether a contract is ambiguous likewise presents a question of law. *Id.* "A contract is ambiguous if its terms may reasonably be interpreted in more than one way . . . but ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Id.* (citations omitted). *See also Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003) ("A contract is ambiguous if it is reasonably susceptible to more than one interpretation."). A contract is ambiguous if it is "obscure in meaning, through indefiniteness of expression, or having a double meaning." *Galardi*, 301 P.3d at 366 (quoting *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009)).

Unambiguous contracts, as a general rule, are construed according to their plain language. *Sheehan & Sheehan v. Nelson Malley and Co.*, 117 P.3d 219, 223–24 (Nev. 2005). The court must read the contract as a whole and avoid negating any contract provision. *Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 380 (Nev. 2012). "[I]n interpreting a contract, the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself." *Sheehan*, 117 P.3d at 224 (citation and interior quotation marks omitted).

If a contract is ambiguous, the court should examine the circumstances surrounding the contract's execution, as well as subsequent acts and declarations of the parties "in order to

determine the true mutual intentions of the parties." *Shelton*, 78 P.3d at 510 (quoting *Hilton Hotels v. Butch Lewis Productions*, 808 P.2d 919, 921 (Nev. 1991)). "An interpretation which results in a fair and reasonable contract is preferable to one that results in a harsh and unreasonable contract." *Id.* (quoting *Dickenson v. State of Nevada, Dep't of Wildlife*, 877 P.2d 1059, 1061 (Nev. 1994)).[1]

### B. Is the Release Ambiguous?

The language of the release at issue is contained in ¶ 4 of the Settlement Agreement:

> <u>General Releases and Waivers by Applicants:</u>  Upon the execution and delivery of this Settlement Agreement, *Transdermal, DPM, Modi and Mattatall and each Applicant*, on his, her or its, as the case may be, own behalf and behalf of his heirs, assigns, attorneys, agents and legal representatives, officers, directors and shareholders *does hereby release, waive and forever discharge each other*, including each of their current and former officers, directors, employee,

---

[1] Mattatall argues that Nevada law also permits consideration of extrinsic evidence to determine *whether* a contract is ambiguous, citing *M.C. Multi-Family Dev., L.L.C. v. Crestdale Assocs., LTD.*, 193 P.2d 536 (Nev. 2008); and *Oracle USA, Inc. v. Rimini Street, Inc.*, 6 F. Supp. 3d 1108 (D. Nev. 2014). The argument does not stand up to scrutiny. It has been squarely rejected by the Nevada Supreme Court in *Frei ex rel. Litem v. Goodsell*, 305 P.3d 70, 73–74 (Nev. 2013), and *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 21–22 (Nev. 2001).

Nevada law *does* recognize the admissibility of extrinsic evidence "of a separate oral agreement as to any matter on which a written contract is silent, and which is not inconsistent with its terms." *M.C. Multi-Family*, 193 P.3d at 545 (quoting *Kaldi*, 21 P.3d at 22). But this exception is of no help to Mattatall because the instant release is not silent and seems to be facially inconsistent with the extrinsic evidence . . . *unless* the release is adjudged to be reasonably susceptible to more than one interpretation, in which case the extrinsic evidence is admissible anyway.

*Oracle* includes reference, in dictum, to a Ninth Circuit ruling, observing that "[i]f a party's extrinsic evidence creates the possibility of an ambiguity, a court may not rely on the text of the contract alone to determine the intent of the parties." *Oracle*, 6 F. Supp. 3d at 1116 (quoting *Foad Consulting Grp., Inc. v. Azzalino*, 270 F.3d 821, 828 (9th Cir. 2001)). However, the quoted language is based on California's "liberal parole evidence rule," not Nevada law. *Foad*, 270 F.3d at 826. It is also at odds with the rule actually applied by the *Oracle* court—i.e., that extrinsic evidence can be considered only if the contract is ambiguous.

Hence, while Nevada courts are concerned to effectuate the intent of the parties, the starting point for the intent inquiry is the language of the parties' agreement. If it is unambiguous, the language will be construed according to its plain meaning. Only if it is ambiguous will extrinsic evidence be considered. *See Sheehan*, 117 P.3d at 223–24.

> shareholders, attorneys and accountants, agents, and successors and assigns, *of and from any and all claims, causes of action, obligations, demands and liabilities whatsoever, of every name and nature, both in law and equity, known and unknown, anticipated and unanticipated, which a Party had, has or hereafter may have*, or which any person or entity may have on any Party's behalf, against each other, including their current and former officers, directors, employees, shareholders, attorneys and accountants, agents and successors and assigns, *because of or arising from any matter, event or thing which has happened, developed or occurred before the execution of this Settlement Agreement.*

R. 18, Sealed Ex. O at ¶ 4, Page ID 426–27 (emphasis added). Focusing on the highlighted language, the district court concluded the release is unambiguous. Because "party" is defined as including Mattatall, the district court held that her claims under the Employment Agreement and Share Purchase Agreement against another party, Transdermal, having arisen before execution of the Settlement Agreement, are within the unambiguous scope of the release.

Mattatall insists that the release, read in context of the Settlement Agreement as a whole, is reasonably susceptible to another interpretation. Mattatall makes several arguments; one is strongest and dispositive. She contends that the "whereas" recitals on the first pages of the Settlement Agreement define the purpose and scope of the agreement. The purpose is to settle the parties' "dispute" (*singular*) defined by the two pending lawsuits: the first being the Fia applicants' action against DPM, Modi and Mattatall, and the second being Transdermal's action against the Fia applicants. Neither action presented any claim specifically involving Mattatall's Employment Agreement or Share Purchase Agreement with Transdermal. Nor does any provision of the Settlement Agreement refer to either of Mattatall's contracts with Transdermal. In neither lawsuit did Mattatall have any interests adverse to Transdermal's. Accordingly, the argument goes, the Settlement Agreement was designed to resolve "the dispute" between *two sets of parties*—the applicants, on the one hand; and Transdermal, DPM, Modi and Mattatall, on the other. The correctness of this understanding is said to be reinforced by the "now therefore"

clause which, by providing that "*the Applicants and the Company* hereby agree as follows . . .", indicates the scope of the dispute being settled. R. 18, Sealed Ex. O, Settlement Agreement at 2, Page ID 425 (emphasis added).

Given this context, Mattatall argues that the language of the release is reasonably susceptible to a narrower and more "logical" construction than that given it by the district court. She argues the release can and should be construed as meaning that "Transdermal, DPM, Modi and Mattatall," *on the one side*, and "each Applicant," *on the other side*, mutually release all claims each party on each side may have against each party on the other side. This construction is said to be supported by the use of two "ands" in the release listing of the parties. But for this "two sides" alignment of the parties, she argues, it would have been unnecessary to include the first "and" in the listing of the parties. The district court's construction of the release is thus said to render the first "and" superfluous.

Mattatall's construction is sensible, and truer to the purpose of the Settlement Agreement, of which the release is part. Quite apart from whether the two "ands" in the listing of parties can bear all the weight of Matattall's argument, her construction of the release, viewed as part of the Settlement Agreement as a whole, is not unreasonable and does not directly conflict with other terms of the release. Her reading of the release is thus consonant with the Nevada law requirement that the contract be read as a whole and in such a way as to avoid negating any contract provision. *See Road & Highway Builders*, 284 P.2d at 380. Yes, the language of the release, viewed in isolation, is also broad enough to bear the construction given it by the district court. But the district court recognized that enforcement of the release in accordance with what it considered to be its plain meaning "is not logical." Considering that Nevada law favors a "fair and reasonable" interpretation over a "harsh and unreasonable" one, *see Shelton*, 78 P.3d at 497,

the scale tips in favor of finding that Mattatall's proffered construction of the release is also reasonable.

Because we find that both constructions of the release are reasonable—i.e., that the language is capable of "having a double meaning," *see Galardi*, 301 P.3d 366, the release is, by definition, "ambiguous" and extrinsic evidence should be considered "to determine the true mutual intentions of the parties," *see Shelton*, 78 P.3d at 497.[2]

### C. Extrinsic Evidence

What is most compelling about Mattatall's proffered extrinsic evidence is that it consists mainly of communications from Transdermal—even though no discovery was conducted before the district court granted summary judgment. Mattatall, herself, has not filed an affidavit detailing her understanding of the release when she signed the Settlement Agreement. But what she has presented, writings from representatives of Transdermal, strongly suggest that Transdermal did not view the release as extinguishing Mattatall's right to bring the instant claims at the time the Settlement Agreement was executed.

First, in apparent response to Mattatall's expressed reluctance to sign the Settlement Agreement because of the facial breadth of the release, Mattatall's counsel, A. Douglas Burns, received reassuring communications from Transdermal's counsel. Attorney Alistair Crawley

---

[2]The conclusion that Mattatall's proffered construction of the release is "reasonable" finds support in the extrinsic evidence as well, discussed below. Granted, the extrinsic evidence is not properly considered unless and until the release is held to be ambiguous. *See* n.1, above. But the significance of Transdermal's own counsel's reassuring representations to Mattatall's counsel—i.e., that the Settlement Agreement would have no effect on Mattatall's claims against Transdermal—can hardly be ignored. Either Transdermal's counsel actually believed what they said, implying that they, too, construed the release more narrowly than its plain language might suggest—thereby corroborating the reasonableness of Mattatall's proffered construction—or they misrepresented their understanding of the release, which lends support to Mattatall's alternative contention that the extrinsic evidence is admissible to show fraud in the inducement, a claim we need not address at this time.

advised Burns in writing the day before the Settlement Agreement was signed that "any claim that Ms. Mattatall has against DPM or Transdermal is wholly extraneous to the matter of the settlement of the Fia Application" . . . and "she is free to pursue it." R. 12-14, Crawley Ltr. 9/27/12 at 2, Page ID 320. Further, on the very day the Settlement Agreement was executed, Transdermal's general counsel, Peter Gennuso, who drafted the Settlement Agreement, informed Burns by email that "Ms. Mattatall's claims of payment are mutually exclusive of getting the Fia application dismissed" and "that indications have been made to Ms. Mattatall that her contract will be honored." R. 12-14, Gennuso Email 9/28/12, Page ID 323. Transdermal correctly argues that these writings do not necessarily mean the release does not bar Mattatall's instant claims, but they raise questions justifying further inquiry.

Second, Mattatall presented copies of four checks, each drawn by Transdermal in the amount of $25,000 and made payable to her and Dr. Modi (two apiece). R. 12-18, 12-19, Checks, Page ID 333, 335, 336. Two of the checks are dated November 30, 2012, and two are dated April 9, 2013, and all four bear notations indicating the payments were related to the Share Purchase Agreement. That is, months after the Settlement Agreement was executed, Transdermal took actions strongly suggesting that it did not consider its previous contractual obligations to Mattatall extinguished by the Settlement Agreement. Again, Transdermal argues this conduct says nothing definite about the enforceability of the release in accordance with its broad terms. True, but the checks represent additional evidence of unanswered fact questions regarding the parties' intent, questions that forestall summary judgment early in the litigation.

Third, Mattatall cites a September 28, 2012 Consent Resolution of the Transdermal Board of Directors acknowledging Transdermal's continuing obligations to her under the Employment Agreement and the Share Purchase Agreement. R. 12-15, Consent Resolution,

Page ID 325. Transdermal contends that the copy filed by Mattatall is signed by only three of the five directors, suggesting the Resolution was proposed but never properly adopted. Again, the Resolution represents some evidence calling into question the parties' mutual intention regarding the scope and operation of the release as part of the Settlement Agreement.

Finally, Mattatall points to April 5, 2013 correspondence from Transdermal to Dr. Modi memorializing an amendment of his rights under the Share Purchase Agreement, pursuant to which he received a total cash payout. R. 28, Sealed Ex. A, Page ID 519. Mattatall views this as further evidence that Transdermal did not consider its Share Purchase Agreement obligations extinguished by the Settlement Agreement. And again, Transdermal contends, unconvincingly, that the amendment says nothing about the enforceability of the release to bar claims brought by Mattatall.

Transdermal is not without colorable arguments. Transdermal correctly argues that the language of the release is broad and unequivocal; that Mattatall was advised by counsel before she signed it; and that the Settlement Agreement could have been easily revised to explicitly carve out the obligations she now asserts if the parties had so intended. But these arguments, in juxtaposition with the inferences that may be reasonably drawn from Mattatall's extrinsic evidence, simply highlight the existence of unanswered questions that warrant further proceedings in the district court. To date, Transdermal has not rebutted, by facts or argument, the distinct impression that Debourah Mattatall, upon raising reasonable concerns about the apparent scope of the release, was reassured both by Transdermal's counsel and her own that her extraneous contract rights were preserved. Yet, when Transdermal decided to discontinue honoring her contract rights, it appears to have invoked the very same broad construction of the

release that it earlier disavowed. On this incomplete record, we conclude simply that genuine issues of material fact remain.[3]

### III. CONCLUSION

Accordingly, finding that the release is ambiguous under Nevada law and that the extrinsic evidence presents unanswered questions of fact that defy resolution as a matter of law on an under-developed factual record, we **VACATE** the district court's summary judgment order and **REMAND** for further proceedings.

---

[3]Because we find that the release is ambiguous and the extrinsic evidence must be considered in determining the parties' intent, we need not reach Mattatall's other defenses to enforcement of the release, i.e., duress, mutual mistake, and fraud in the inducement.