Honorable Mike K. Nakagawa, United States Bankruptcy Judge
On October 30, 2018, a trial was conducted in the above-captioned adversary proceeding. The appearances of counsel were noted on the record.
After consideration of the evidence and arguments presented at trial, the court enters this Memorandum Decision, which constitutes the court's findings of fact and conclusions of law pursuant to FRBP 7052 and FRCP 52.
FACTUAL AND PROCEDURAL BACKGROUND
On June 15, 2017, a "skeleton" Chapter 13 petition was filed by Laura L. Faulkiner ("Debtor"). (ECF No. 1). Administration of the Debtor's Chapter 13 proceeding was assigned to panel trustee Kathleen A. Leavitt and the Debtor's meeting of creditors was scheduled for July 25, 2017. (ECF No. 4).
On July 18, 2017, Debtor filed her schedules of assets and liabilities ("Schedules"), Statement of Financial Affairs ("SOFA"), and other required information. (ECF No. 12). In response to Question 9 of the SOFA, Debtor disclosed that a lawsuit entitled Christopher Shults ("Plaintiff") v. Laura Faulkiner, Case No. A-16-734705-C ("State Court Action") was pending in the Eighth Judicial District Court, Clark County, Nevada ("State Court").[2] On her Schedule "A/B," Debtor listed her current residence located at 6048 Tokara Avenue, Las Vegas, Nevada, as well as a variety of personal property assets. On her Schedule "C," she claimed all of the equity in her scheduled assets as exempt under Nevada *430 law. Her meeting of creditors was concluded on July 25, 2017 (ECF No. 20), and no one objected to her claimed exemptions.
On September 25, 2017, Plaintiff commenced the instant adversary proceeding against the Debtor by filing a "Complaint for Determination of Dischargeability and Objecting to Debtor's Discharge Pursuant to Section 523 of the Bankruptcy Code ("Complaint").[3] (AECF No. 1). Plaintiff alleges that the Debtor borrowed funds from him before the Chapter 13 proceeding was commenced and that the Debtor's personal liability for those funds is excepted from discharge under Sections 523(a)(2)(A) and 523(a)(2)(B).[4]
On November 22, 2017, Debtor filed an answer ("Answer") to the Complaint. (AECF No. 7).
On November 28, 2017, an order was entered confirming the Debtor's Chapter 13 plan. (ECF No. 36).[5]
On November 29, 2017, Debtor filed an amended answer to the Complaint. (AECF No. 9).
On February 21, 2018, Debtor filed a modified Chapter 13 plan. (ECF No. 38).[6]
On March 7, 2018, a joint discovery plan was filed, wherein the parties agreed that discovery would close by July 23, 2018. (AECF No. 11).
On March 30, 2018, an order was entered scheduling a pretrial conference for October 11, 2018, and a one-day trial for October 30, 2018. (AECF No. 12).
On May 25, 2018, an order was entered confirming the modified Chapter 13 plan. (ECF No. 47).[7]
On September 27, 2018, Plaintiff filed his trial statement ("Plaintiff Trial Statement"). (AECF No. 14).
*431 On October 4, 2018, Debtor filed her trial statement (AECF No. 17).[8]
On October 8, 2018, Debtor filed an amended trial statement to correct the adversary case caption ("Debtor Trial Statement"). (AECF No. 20).
On October 11, 2018, the pretrial conference was completed.
THE EVIDENTIARY RECORD
Both the Plaintiff and the Debtor were subject to direct and cross-examination at trial. Prior to trial, Plaintiff provided a binder that included nine exhibits, but only Exhibit "7" consisting of Debtor's response to Plaintiff's request for admissions ("ROA")[9] propounded in the State Court Action,[10] was admitted at trial. Similarly, Debtor provided a binder that included seven exhibits, but only Exhibit "A" and Exhibit "F" were admitted at trial. Exhibit "A" consists of a copy of a transcript of the Debtor's deposition taken on April 18, 2017, in the State Court Action ("Depo Transcript")[11] and Exhibit "F" consists of an email string between the parties on October 9, 2014, and another email on November 16, 2014.
*432 The October 9, 2014, email is in two parts. The first part is from the Plaintiff to the Debtor and states as follows:
Laura
As you know it's been a year since the condo was purchased. I would like to know what your intentions are to either pay interest on the loan or purchase the property outright. As I recall we discussed an interest payment of $215 per month plus the reimbursement of the moving expenses I advanced.
Let me know what your thoughts are.
Chris
The second part of the October 9, 2014 email is from the Debtor to the Plaintiff and states as follows:
Hi Chris,
Your note caught me by surprise for a few reasons. Mostly because, as I (and others) recall, this was something we were going to deal with in two years, not one. Please be assured when I can, I will reimburse you, but it is not possible for me to do so at this time.
I won't go into details of my finances, which you were aware of last year. They really are not much better now. As you know, it helps when your house sells. I hope mine will do so in the spring. Meanwhile, I continue to have living expenses in Kansas, help support my mother, and help Janet with the kids' expenses. Jane and Emma still love coming to Vegas, and as long as I can afford to bring them, I will. You promised if I got the condo you would fly them out twice a year, but obviously things changed. This year I could only take them for spring break, which is still a wonderful gift to them and to Janet as it gives her a break. I have done the best I can with the limited resources I have. The condo is a luxury that I may have to do without someday. Until then, please don't dampen my joy unnecessarily. I appreciate everything you have done for me and my family.
You have moved on, and I wish you well. But some things are between you and me. The condo is one of them. We had lots of conversations about a lot of things. Again, I won't go into details. Life changes things. I promise to do my best to make it right when I can, just as you helped me when you could.
So those are my thoughts.
The November 16, 2014 email is from the Debtor to the Plaintiff and states as follows:
Chris,
There was never an agreement between us regarding funding the condo other than that I would pay you back sometime; most likely when I sold the condo. Details were bandied about, but nothing actually agreed upon. It was a loose, friend-to-friend transaction - everything to be determined in the future. To say otherwise, is simply not true.
I didn't come close to getting $5000 from my adjusted income tax returns. From the much smaller amount I received, Janet's fee was $450, which I paid immediately. The balance was used to pay the taxes I owed for the current tax year. We did not discuss that money going to you at all. The only comment about the amended returns was when you asked the receptionist to put my fee on your bill. She said she could not, but that you could pay it when I was billed. Again, that was a generous offer, but I did not ask (or expect) you to pay for it.
You clearly know what my financial situation has been and still is. I believed that knowledge and our friendship is why you helped me and my family until you took on Jana and her family to care for and help. I mention that because I feel Jana's resentment toward me is the *433 reason you are pressuring me now. That does not mean you should come to me and expect immediate compensation for your previous generosity. You did what you could when you could. Thank you; I will do the same.
Furthermore, interest is not an issue as there was no agreement on interest at all. In fact, you totally resisted any conversation about interest and/or payback until now. Hopefully you will, in the future, reach a clear and firm agreement with people - like having a legal pre-nup, for instance - to avoid misunderstandings.
As I said earlier, I will let you know when I sell my house or the condo and am able to return the money you offered me so willingly. I suggest you accept that and leave me alone in the meantime.
Thank you.
Laura.
Other than the copies of the ROA response, Depo Transcript, and emails, no other written materials were admitted at trial.
APPLICABLE LEGAL STANDARDS
Under Section 1328(a), a Chapter 13 discharge is entered as soon as practicable after the debtor completes all payments required under the confirmed plan. Section 1328(a) also provides that the Chapter 13 discharge does not include debts of the kind specified, inter alia , under Section 523(a)(2). See 11 U.S.C. § 1328(a)(2).
Section 523(a)(2) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]
(B) use of a statement in writing -
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive..."
11 U.S.C. § 523(a)(2) (A and B) (emphasis added).[12]
Unlike Section 523(a)(2)(B), the elements that must be proven by the objecting creditor under Section 523(a)(2)(A) are not set forth in the statute. The elements required under Section 523(a)(2)(A), however, have been established under case law. In this circuit, a claim for actual fraud under Section 523(a)(2)(A) requires a creditor to prove: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." Turtle Rock Meadows, etc. v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000) (emphasis added). See Sachan v. Huh (In re Huh), 506 B.R. 257, 262 (9th Cir. BAP 2014).[13] The "intent to defraud *434 is a question of fact," and the "intent to deceive can be inferred from the surrounding circumstances." Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1018 (9th Cir. 1997).[14]
Where a creditor's claim under Section 523(a)(2) is based on a forbearance, the creditor must prove that "it had valuable collection remedies at the time it agreed to renew, and that such remedies lost value during the renewal period." See Stevens v. Nw. Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 306 (9th Cir. 1992) (claim brought under Section 523(a)(2)(B) ); Cho-Hung Bankv. Kim (In re Kim), 163 B.R. 157, 161 (9th Cir. BAP 1994), aff'd and adopted, 62 F.3d 1511 (9th Cir. 1995) (claim brought under Section 523(a)(2)(A) ). See, e.g., Hillsman v. Escoto (In reEscoto), 2017 WL 1075046 (9th Cir. BAP Mar. 21, 2017), aff'd, 713 Fed.Appx. 722 (9th Cir.), cert. denied, --- U.S. ----, 139 S.Ct. 321, --- L.Ed.2d ---- (2018) (creditor failed to meet burden of proving that he had valuable collection remedies at the time of undisclosed settlements and that the remedies lost value).
The plaintiff seeking a determination of nondischargeability under Section 523(a) bears the burden of proof by a preponderance of the evidence. See In re Slyman, 234 F.3d at 1085 ; In re Huh, 506 B.R. at 262.
DISCUSSION
There is no dispute that a condominium located at 3400 Cabana Drive, Unit 1020, in Las Vegas, Nevada ("Las Vegas Condo"), was acquired by the Debtor on or about October 10, 2013, for the purchase price of $73,500. There is no dispute that the Plaintiff provided the funds for that purchase, but that title to the Las Vegas Condo was only in the Debtor's name. There also is no dispute that in October 2013, Plaintiff provided another $5,000 to the Debtor ostensibly to furnish the Las Vegas Condo. There is no dispute that the purchase price was a loan from the Plaintiff to the Debtor, but there is a dispute as to whether the additional $5,000 was a loan or a gift.
There is no dispute that the Plaintiff and the Debtor were personally acquainted for many years before the acquisition of the Las Vegas Condo. There is no dispute that prior to providing the loan and the additional funds, Plaintiff had knowledge of certain real property assets of the Debtor located in Russell, Kansas, as well as certain personal property assets. There also is no dispute that prior to providing the loan and additional funds, Plaintiff had certain knowledge regarding the Debtor's financial circumstances and ability to acquire the Las Vegas Condo.
There is no dispute that the loan for the purchase price was not secured by a deed of trust against the Las Vegas Condo. There is no dispute that neither a promissory *435 note nor a loan agreement was executed by the Debtor with respect to the loan nor to the additional funds provided by the Plaintiff. There is no dispute that neither the loan nor the additional funds have been repaid to the Plaintiff by or on behalf of the Debtor.
There is no dispute that the Plaintiff and the Debtor exchanged email messages regarding the loan and the additional funds on October 9, 2014, as well as on November 16, 2014. There is no dispute that Plaintiff subsequently requested repayment of the loan and additional funds. There is no dispute that on April 7, 2016, Plaintiff commenced the State Court Action to collect the loan and additional funds after his request was not met. There is no dispute that after the State Court Action was commenced, Debtor sold the Las Vegas Condo and used the proceeds towards the purchase of the property in which she currently resides. There is no dispute that after Plaintiff filed a motion for summary judgment in the State Court Action, Debtor commenced the instant bankruptcy proceeding.[15]
There is no dispute under the Debtor's confirmed modified Chapter 13 Plan, the unpaid amount of the loan and the additional funds would share pro rata from the limited funds available for payment of non-priority, general unsecured claims. See discussion at note 6, supra. There is no dispute that if Plaintiff prevails in this adversary proceeding, the Debtor's personal liability for the loan and perhaps additional funds will not be discharged even if she completes her Chapter 13 plan and the Plaintiff could continue to pursue collection from the Debtor's non-exempt property.[16]
Against this backdrop and limited documentary evidence, the court is presented with the testimony of two former friends who essentially accused each other of "misremembering" at best and misrepresenting the facts at worst.[17] For example, Plaintiff testified that he had numerous discussions with the Debtor about her personal financial situation and ability to finance the purchase of the Las Vegas Condo, while the Debtor testified that the discussions never occurred. Likewise, Plaintiff testified that the parties reached an understanding *436 about the repayment of the loan and additional funds, while Debtor testified that no such understanding was ever reached. Either someone's memory of the events is faulty, or someone's testimony is intentionally false.[18] Resolution of this conflicting testimony, if necessary, may determine whether the Plaintiff has met his burden of proof of the elements required by Sections 523(a)(2)(A) or 523(a)(2)(B). As a threshold matter, however, the parties also dispute whether the Plaintiff is barred by the Statute of Frauds from attempting to collect the loan.
1. The Statute of Frauds.
Appropriate to the instant case, the original Statute of Frauds enacted under English law in 1677 was entitled "An Act for the Prevention of Frauds and Perjuries." See Restat 2d of Contacts, § Scope (2nd 1981), citing 29 Charles II, c.3. By requiring certain agreements to be memorialized in writing, the statute was designed to prevent fraud from being perpetrated through perjured testimony as to the existence and terms of an agreement. Thus, the primary purpose of the Statute of Frauds is evidentiary. See Restat 2d of Contracts, supra, § 132, comment a. ("The requirements of the Statute of Frauds, designed primarily to serve an evidentiary purpose, are less rigorous than those of the Statute of Wills, which is designed to serve cautionary and channeling purposes as well."); id. at § 132, comment a. ("The rule of this Section reflects the general assumption that the primary purpose of the Statute of Frauds is evidentiary, that it is not intended to facilitate repudiation of oral contracts."). Compare Restat 2d of Contracts, supra, § 130, comment a (The English Statute of Frauds applied to an action 'upon any agreement that is not to be performed with the space of one year from the making thereof.' The design was said to be not to trust the memory of witnesses for a longer time than one year, but the statutory language was not appropriate to carry out that purpose."). Except for Louisiana, a similar Statute of Frauds exists in every State, including Nevada, either through legislation or by judicial decision.[19] See Restat 2d of Contracts, supra, § Scope.[20]
In Nevada, a specific Statute of Frauds exists for the creation of estates in land, see NRS 111.205, for land sale or lease contracts for periods longer than one year, see NRS 111.210, and for the assumption of liabilities by personal representatives of a decedent's estate. See NRS 147.230.[21] A more general Statute of *437 Frauds exists under NRS 111.220, which provides as follows:
In the following cases every agreement is void, unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith:
1. Every agreement that, by the terms, is not to be performed within 1 year from the making thereof.
2. Every special promise to answer for the debt, default or miscarriage of another.
3. Every promise or undertaking made upon consideration of marriage, except mutual promises to marry.
4. Every promise or commitment to loan money or to grant or extend credit in an original principal amount of at least $100,000 made by a person engaged in the business of lending money or extending credit.
5. Every promise or commitment to pay a fee for obtaining a loan of money or an extension of credit for another person if the fee is $1,000 or more.
(Emphasis added). The "note or memorandum" required to satisfy the Statute of Frauds may consist of multiple writings that relate to the same transaction, see Restat 2d of Contracts, supra, § 132, and may be made or signed any time after the agreement is formed. See Restat 2d of Contracts, supra, § 136.
The Statute of Frauds is an affirmative defense that must be raised by the defendant in its answer to the plaintiff's complaint. See FED.R.CIV.P. 8(c)(1) ; NEV.R.CIV.P. 8(c). Affirmative defenses that are not raised in the defendant's answer, are deemed waived. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) ; In re Adbox, Inc., 488 F.3d 836, 842 n.2 (9th Cir. 2007) ; The Mirage Casino-Hotel, LLC v. Eighth Judicial District Court, 2018 WL 3625673, at *2 (Nev. July 26, 2018) ; Hefetz v. Beavor, 397 P.3d 472, 477-78 (Nev. 2017).
Under Nevada law, a party whose breach of contract claim is barred by the Statute of Frauds is not without a remedy. Under a theory of unjust enrichment, the party may pursue a claim for legal restitution based on the common law concept of a "quasi-contract" between the parties. In Unionamerica Mortg. and Equity Trust v. McDonald, 97 Nev. 210, 626 P.2d 1272 (Nev. 1981), the Nevada Supreme Court explained:
The terms "restitution" and "unjust enrichment" are the modern counterparts of the doctrine of quasi-contract. Smith v. Smith, 95 Idaho 477, 511 P.2d 294 (1973). The purpose of quasi-contractual relief is to do justice to the parties regardless of their intention. Trollope v. Koerner, 106 Ariz. 10, 470 P.2d 91 (1970).
"The essential elements of quasi contract are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." Dass v. Epplen, 162 Colo. 60, 424 P.2d 779, 780 (Colo. 1967).
Unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another. L & A Drywall, Inc. v. Whitmore Const. Co. Inc., 608 P.2d 626 (Utah 1980).
*438 97 Nev. at 212, 626 P.2d at 1273-74. See Wynn Las Vegas, LLC v. Tofani, 2017 WL 6541827, at *6 n.7 (Nev. Ct. of Appeals, Dec. 14, 2017).[22] See also Pribyl v. Allstate Insurance Company, 2018 WL 4088015, at *6 (D.Nev. Aug. 27, 2018) ("[U]njust enrichment is a quasi-contract theory that applies only when there does not exist an express contract.").
In this instance, the Debtor did not raise the Statute of Frauds as an affirmative defense in her Answer to the Complaint.[23] No pleading motions, nor summary adjudication motions were ever prosecuted in this adversary proceeding. Notwithstanding Debtor's apparent waiver of the affirmative defense, however, Plaintiff raised the Statute of Frauds in the trial statement that he filed on September 27, 2018. See Plaintiff Trial Statement at 9:25 to 11:3.[24] He maintains that email messages exchanged with the Debtor on October 9, 2014, and November 16, 2014, see 5-7, supra, were sufficient to satisfy the Statute of Frauds. Id. at 10:26 to 11:3. Not surprisingly, Debtor argues that there was no written contract and that the only writings admitted into the record, i.e., the email messages, are insufficient to establish the terms of a binding contract. See Debtor Trial Statement at 5:12 to 7:15.
Because the absence of an enforceable written contract would not bar an alternative claim under Nevada law for restitution based on unjust enrichment, it is unnecessary to determine whether the email messages constitute a "note or memorandum thereof expressing the consideration" for an agreement between the parties. More important, the evidentiary purpose of the Statute of Frauds is not an overriding concern in this case: Debtor testified that she received the $73,500 loan as well as the additional $5,000 from the Plaintiff, that none of the funds were repaid, and that she intended to pay the Plaintiff back.
Thus, assuming the funds provided by the Plaintiff to purchase the Las Vegas Condo was a loan to the Debtor, rather than a gift, the question is whether that prepetition debt is excepted from discharge.
*439 2. Application of Section 523(a)(2)(A) and Section 523(a)(2)(B).
The Complaint is framed as separate claims under Section 523(a)(2)(A) and Section 523(a)(2)(B). By its terms, a claim under Section 523(a)(2)(A) for money or an extension or renewal of credit obtained by false pretenses, false representations, or actual fraud, may not be based on a "statement respecting the debtor's financial condition." If the claim is based on such a statement, that statement must be made in writing under Section 523(a)(2)(B). Due to the structure of Section 523(a)(2), debts incurred on the basis of oral statements respecting the debtor's financial condition simply are not excepted from discharge. See Lamar Archer & Cofrin v. Appling, --- U.S. ----, 138 S.Ct. 1752, 1757 and 1764, 201 L.Ed.2d 102 (U.S. 2018).
In this case, the Complaint alleges that the Debtor made promises to repay the loan without the intention of ever repaying the loan. See Complaint at ¶¶ 24, 25. It also alleges that the Debtor made statements that she had sufficient resources to repay the loan. Id. at ¶ 30. The Complaint further alleges that the Debtor made additional promises to repay the loan that caused the Plaintiff to stall any collection efforts. Id. at ¶¶ 19, 24. Against these allegations, the court has considered the testimony of the parties and the documentary evidence admitted at trial. Based on these considerations, the court concludes that the Plaintiff has failed to meet his burden of proof under both Section 523(a)(2)(A) and Section 523(a)(2)(B).
At trial, Plaintiff testified that neither the loan, nor the additional funds, were a gift to the Debtor, and that he always expected to be repaid.[25] He testified that none of the information he received from any source concerning the Debtor's assets, income, pension payments, Social Security benefits, or employment status, was incorrect or misrepresented in any fashion. Plaintiff attested, however, that when he provided the $73,500 to the Debtor, as well as the additional $5,000, the Debtor never had the intention to repay him. Not unexpectedly, Debtor denied this accusation, and testified at trial that she fully intended to repay the Plaintiff when she was able to do so.
Having considered the testimony of the witnesses at trial, in addition to the portions of the Depo Transcript cited and the response to the ROA, the court finds the Debtor's testimony to be credible. Although the court is not impressed that the Debtor would throw her state court counsel under the bus for allegedly providing an inaccurate or unauthorized response to ROA No. 3, the court concludes that the Debtor's trial testimony is not inconsistent with her deposition testimony and email correspondence to the Plaintiff. Debtor candidly acknowledged that she considered the possibility that the Plaintiff might not expect to be repaid when he provided the funds for the Las Vegas Condo, but that she nonetheless intended to repay him back when she was able to do so. Although commencement of even de minimus monthly payments to the Plaintiff might have bolstered the Debtor's testimony, even the Plaintiff testified that neither of the parties contemplated any repayment before one year. Under these circumstances, the court concludes that the Debtor intended to repay the loan and did not have an intent to deceive the Plaintiff at the time the loan was made.[26] Plaintiff's claim under Section 523(a)(2)(A) therefore lacks merit.
*440 Plaintiff's claim under Section 523(a)(2)(B) fares no better. Because the Plaintiff also testified that he received nothing in writing before the loan was made in October 2013, and nothing in writing about the loan before the emails in October and November 2014, there can be no doubt that the loan and additional funds were not "obtained by" the use of a written statement that was materially false. Because the Plaintiff concedes that any information he received respecting the Debtor's financial condition was not incorrect nor misrepresented, he also has not met the first element required under the statute, i.e., that he was provided materially false information. Moreover, Plaintiff also testified that the information he had respecting the Debtor's financial condition may have been obtained through his personal observations of the Debtor's assets and knowledge gleaned from personal experience. There is no suggestion that the Debtor caused this information to be made in writing or published to the Plaintiff, much less with the intent to deceive. Plaintiff's claim under Section 523(a)(2)(B) therefore lacks merit.
But Plaintiff also alleges that the Debtor made additional, subsequent deceptive statements of her intent to repay so as to prevent the Plaintiff from taking steps to collect the funds. As previously noted, Plaintiff's own testimony was that repayment was to begin one year after the loan was made. Because the loan was provided on October 10, 2013, when the Las Vegas Condo was purchased in the Debtor's name, the repayment period would have begun no earlier than October 10, 2014, according to the Plaintiff's own testimony. Moreover, Plaintiff testified that if the entire loan amount was not paid, then monthly interest payments of $215 were to commence.
To prevail on a forbearance theory, the Plaintiff must prove by a preponderance of the evidence that he had valuable collection remedies at the time the Debtor made any additional deceptive statements, and that his collection remedies lost value during the forbearance period. See discussion at 8, supra. In this instance, the evidence establishes that the repayment period for the subject loan commenced no earlier than October 10, 2014, and the forbearance period ended no later than April 7, 2016, when the Plaintiff commenced the State Court Action.
During that period, there is no dispute that the Plaintiff was never on title to the Las Vegas Condo, that he never received a deed of trust against the property to secure repayment of the funds, and that he never obtained a judgment against the Debtor. There is no suggestion that the Plaintiff had a lien against any other real property owned by the Debtor, nor that he obtained a security interest, perfected or unperfected, against any personal property of the Debtor. Absent a deed of trust, Plaintiff could not pursue a non-judicial foreclosure of the Las Vegas Condo. Likewise, he could not pursue a non-judicial foreclosure sale of any other real property owned by the Debtor. Absent a judgment in his favor in the State Court Action and recordation of a judicial lien against the *441 Las Vegas Condo, Plaintiff also could not seek an execution sale of the Las Vegas Condo even if the Debtor failed to claim Nevada's $550,000 homestead exemption under NRS 115.010. Likewise, absent any judgment in the State Court Action or from any other court of competent jurisdiction, Plaintiff could not record a judgment against any other real property of the Debtor and then seek an execution sale.
Similarly, absent a lien or security interest in the Debtor's personal property, Plaintiff would have been required to obtain a judgment in the State Court Action and then pursue execution of the judgment under Nevada law. In addition to the Nevada homestead exemption, Debtor could claim the exemptions available under NRS 21.090(1). If the Debtor has any non-exempt assets available to satisfy a judgment, the value of any collection remedies could be established.
In this case, however, Plaintiff has not offered sufficient evidence to establish the value of any collection remedies that may have existed at the time of any of the additional deceptive statements allegedly made by the Debtor. Even if the November 16, 2014 email is sufficient to establish an intentionally deceptive statement that caused Plaintiff to forbear from immediately pursuing an available collection remedy, he has offered no evidence sufficient to establish the amount he could have collected at that time. Without that benchmark, the court has no basis on which to determine that the Plaintiff's remedies lost value during the forbearance period. Obviously, the unpaid total amount of the original loan and additional funds establish a ceiling for the Plaintiff's claim, but it does not establish the amount of the collection value that was lost. Moreover, while the Plaintiff intimated that the Debtor gave repeated, deceptive assurances that she would repay, neither the dates on which the assurances were given, nor the value of the available collection remedies on those dates, has been established. Thus, even on a forbearance theory, Plaintiff has failed to meet his burden of proof under both Section 523(a)(2)(A) and Section 523(a)(2)(B).
CONCLUSION
Because the parties agree that the Plaintiff provided $73,500, plus an additional $5,000 to the Debtor to purchase and furnish the Las Vegas Condo, and that none of those amounts were repaid, it is not necessary to apply the Statute of Frauds. Moreover, even if the Statute of Frauds was not waived and is applied in this proceeding, an unjust enrichment claim for restitution on a quasi-contract theory could still be pursued without necessity of a writing.
The evidence presented at trial, however, was insufficient to meet the Plaintiff's burden of proof under both Section 523(a)(2)(A) and Section 523(a)(2)(B). Plaintiff failed to demonstrate by a preponderance of the evidence that the Debtor had the requisite intent to deceive under either exception to dischargeability of debt. Moreover, Plaintiff failed to prove that he had any valuable collection remedies at the time of any subsequent nondischargeable conduct by the Debtor, or that any such collection remedies lost value.
Therefore, a judgment will be entered dismissing this adversary proceeding with prejudice. Each party shall bear their own attorney's fees and costs.

The court takes judicial notice of the docket in the State Court Action pursuant to FRE 201. See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of court filings in a state court case where the same plaintiff asserted similar and related claims); Hott v. City of San Jose, 92 F.Supp.2d 996, 998 (N.D. Cal. 2000) (taking judicial notice of relevant memoranda and orders filed in state court cases).

Although the title of the Complaint states that the Plaintiff is objecting to the Debtor's discharge, the prayer of the Complaint does not do so. Instead of seeking to deny the Debtor a discharge of all debts, the Complaint seeks only a determination that her debt to the Plaintiff will not be discharged by her bankruptcy.

The Complaint seeks a determination of dischargeability solely under Section 523(a)(2). Thus, Plaintiff does not allege, nor has he offered evidence, that the Debtor's obligations are excepted from a Chapter 13 discharge based on larceny, embezzlement, or defalcation by a fiduciary under Section 523(a)(4), nor that they are the product of willful or malicious injury under Section 1328(a)(4).

The Chapter 13 plan that was initially confirmed provided that over a five-year period, the Debtor will pay a total of $16,764, as well as contribute the non-exempt portion of any tax refunds from 2017 through 2021, to the Chapter 13 trustee for distribution to creditors. That Plan estimated that the amount of $10,476 will be available for payment of non-priority, general unsecured claims.

The modified Plan provides that over a five-year period, the Debtor will pay a total of $17,726, as well as contribute the non-exempt portion of any tax refunds from 2017 through 2021, to the Chapter 13 trustee for distribution to creditors. It also provides an estimate of $5,000 in additional administrative expenses for representation by her attorney in the instant adversary proceeding. Due to the increased administrative expenses, the modified Plan estimates that the amount of only $5,842.40 will be available for payment of non-priority, general unsecured claims. According to the claims register maintained in this Chapter 13 proceeding, six creditors filed timely proofs of claim, including the Plaintiff's claim in the amount of $95,977.26, of which $102,592.26 represents claims for non-priority, general unsecured debts. Assuming there is no objection to the amount set forth in Plaintiff's proof of claim, he would receive a pro rata distribution of approximately six percent of the amount in his claim.

Debtor properly disclosed her Social Security benefits and Pension receipts in her Chapter 13 Statement of Current Monthly Income filed on July 18, 2017. (ECF No. 13). The Social Security benefits were properly excluded from the calculation of current monthly income under Section 101(10A)(B). Debtor apparently did not include her monthly Social Security benefits in calculating projected disposable income contributions to her confirmed Chapter 13 plan. No one asserted, however, that the confirmed plan was not proposed in good faith as required by Section 1325(a)(3), and no one appealed the order confirming the modified Chapter 13 plan that was entered on May 25, 2018.

Along with the trial statement, Debtor filed a motion in limine to exclude as hearsay certain statements contained in an Affidavit of Elena Santiago. (AECF Nos. 15 and 16). On October 16, 2018, the parties filed a stipulation resolving the motion. (AECF No. 23). The subject affidavit, however, was never introduced nor admitted at trial.

The ROA was propounded in the State Court Action and the response is dated April 6, 2017. It is signed by the Debtor's state court counsel and does not include a verification by the Debtor. Request No. 3 asks for an admission that when the Debtor took the "$73,500 from Plaintiff that you never intended to pay him back." The response in the ROA states "ADMIT" but at trial the Debtor disputed that she ever made such an admission and that it was provided only by her then-counsel. When her deposition was taken twelve days later on April 18, 2017, Debtor testified in response to various questions about her intention in connection with the loan. Both the Depo Transcript and the ROA response were used by the Plaintiff in this adversary proceeding in attempting to impeach the Debtor's testimony at trial.

NRCP 36(b) provides that "Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." (Emphasis added.) There is no evidence in the record that the Debtor filed a motion before the State Court to withdraw or amend her responses to the ROA. However, NRCP 36(b) also concludes with the following: "Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding." (Emphasis added.) Thus, while any admissions in response to the ROA might have been conclusive in the State Court Action, those admission are not conclusive in this adversary proceeding.

The Depo Transcript was included as Exhibit "3" in the Plaintiff's exhibit binder as well as Exhibit "A" to the Debtor's binder. For some reason, Debtor objected to the Plaintiff's use of Exhibit "3" to cross-examine the Debtor at trial, so the Debtor's Exhibit "A" was used instead. Ordinarily, a certified copy of a deposition transcript is published at trial, but neither side objected to use of the photocopy. Additionally, only portions of a deposition transcript typically are offered at trial for impeachment purposes.

Section 523(a)(2)(C) credits a rebuttable presumption of nondischargeability under Section 523(a)(2)(A) when an individual debtor incurs certain consumer debt for "luxury goods and services" or obtains cash advances shortly before seeking bankruptcy relief. That presumption does not apply in this proceeding.

In Husky Int'l Electronics v. Ritz, --- U.S. ----, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (U.S. 2016), the Court determined that a nondischargeable claim under Section 523(a)(2)(A) does not require proof that a debt was obtained through representations by the debtor that induced the creditor to extend credit. Rather, actual fraud also may be demonstrated by proof that the debtor engaged in a fraudulent scheme of transferring assets to place them out of reach of the creditor. Plaintiff does not assert such a theory of actual fraud in the instant case.

As a threshold matter, a prebankruptcy debt "for money...or an extension, renewal, or refinancing of credit" is excepted from discharge under Section 523(a)(2) only to the extent "obtained by" the conduct described in subsections (A) and (B). Additional debt that arises from money obtained by fraud, such as treble damages, fines or attorney's fees, also are excepted from discharge. See Cohen v. de la Cruz, 523 U.S. 213, 219-220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

The docket in the State Court Action reflects that the Plaintiff recorded a lis pendens with respect to the Debtor's current residence on or about March 14, 2017. The docket also reflects, however, that an order granting Debtor's motion to expunge the lis pendens was entered on or about May 4, 2017.

No one objected, however, to the Debtor's exemption of her current residence and personal property. See discussion at 2, supra. As a result, those assets are exempt in her bankruptcy proceeding under Section 522(l). According to the Debtor's Schedule I, her monthly income is derived from two sources: Social Security ($1,586.00) and Pension or Retirement Income ($4,857.00). If those sources of income are otherwise exempt from execution, the Plaintiff ultimately may collect very little on a judgment for the loan and additional amount, even if he prevails in this adversary proceeding.

A bizarre thread emerged in this case that the Plaintiff's generosity to other women in addition to the Debtor somehow impacted the validity of the claims he is pursuing against the Debtor. It is not clear to the court if the Plaintiff's largesse to others was thought to be relevant to whether the $73,500 and additional $5,000 was actually intended or thought to be a gift to the Debtor rather than a loan. This thread was not developed at trial. Plaintiff previously received an admonition from the Debtor in the November 16, 2014, email to "get it in writing" next time, and it is clear that the Debtor's confirmed Chapter 13 will pay him back only a fraction of his money. In Winter v. Natural Resources Defense Council, 555 U.S. 7, 31, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), Chief Justice Roberts included the oft-quoted observation that "no good deed goes unpunished." That observation may well apply in this case.

Under Section 524(f), an individual who receives a discharge is not prohibited from voluntarily repaying a debt even though the debt can no longer be pursued as a personal liability of the debtor. This provision permits an individual who receives a discharge to repay a discharged debt even if the individual is not legally required to do so.

Presumably, a Statute of Frauds was not immediately adopted in Louisiana because its legal system is based on the civil laws of France rather than on English common law traditions.

The Restatement (Second) of Contracts commonly is followed by courts in Nevada in applying contract law principles. See, e.g., Road & Highway Builders v. N. Nev. Rebar, 128 Nev. 384, 392, 284 P.3d 377, 382 (Nev. 2012) ; 26 Beverly Glen, LLC v. Wykoff Newberg Corp., 334 Fed.Appx. 62, 63-64 (9th Cir. 2009) ; Andrew v. Century Sur. Co., 134 F.Supp.3d 1249, 1263 (D.Nev. 2015) ; In re Seare, 493 B.R. 158, 200 (Bankr. D.Nev. 2013).

Nevada also adopted the Uniform Commercial Code, see NRS 104.1101 to 104.9717, including the various specific Statute of Frauds applicable, e.g., in sales and leasing transactions. See NRS 104.2201(1), NRS 104A.2201(1)(b). Negotiable instruments consisting of unconditional promises or orders to pay a fixed amount of money, see NRS 104.3104(1), also must be in writing. See NRS 104.3103(1) (e and h).

In Tofani, the Nevada intermediate appellate court observed that "An equitable claim like unjust enrichment requires no proof whatsoever of intent or state of mind; it's a strict liability claim based solely on notions of equity." Id. Although bankruptcy courts are courts of equity, the exception to discharge of any claim under Section 523(a)(2) is not based on strict liability. Rather, the plaintiff must prove that the debtor had the intent to deceive when it obtained the benefit at issue.

Before she filed an answer to the complaint in the State Court Action, Debtor filed a motion for summary judgment asserting that the loan obligation was unenforceable based on, inter alia , the Statute of Frauds. In addition to his breach of contract claim, however, Plaintiff's state court complaint included a cause of action for unjust enrichment. Plaintiff opposed the Debtor's summary judgment motion and the Debtor filed a reply. On June 6, 2016, at the end of a hearing on the motion, the state court denied summary judgment. It is not clear from the minutes of the hearing whether summary judgment was denied as a matter of law, or, due to the presence of genuine disputes of fact. Thereafter, Debtor answered the state court complaint on June 29, 2016, but she did not raise the Statute of Frauds as an affirmative defense.

Plaintiff attached ten exhibits to his trial statement, most of which apparently were included in the binder of exhibits submitted before trial. Because counsel would not stipulate to the admission of their respective exhibits at the beginning of the trial, however, the exhibits were admitted only if specifically offered and admitted during the trial. As previously noted, only Plaintiff's Exhibit "7" and Debtor's Exhibits "A" and "F" were admitted into evidence.

He also testified that the parties never intended that the funds be repaid within one year, but that the Debtor was not prohibited from repaying the sums back within one year.

Because the court finds that the Debtor did not misrepresent her intention to repay, the Plaintiff's failure to obtain a deed of trust against the Las Vegas Condo, or to require a promissory note or other written agreement, is not attributable to any misconduct by the Debtor. If the court concluded otherwise, the Debtor's alleged misrepresentation as to her intent to repay a trusted friend arguably would satisfy the first four elements of a claim under Section 523(a)(2)(A). See discussion at 7-8, supra. Unlike a forbearance theory, see discussion at 8, supra, the fifth and final element arguably would be satisfied by the uncontested amount of the unpaid loan and additional funds.